## UNITED STATES v. BOYER.

(District Court, W. D. Missouri, W. D. February 28, 1898.)

1. CONSTITUTIONAL LAW—SLAUGHTER-HOUSE INSPECTION.

The acts of congress found in 1 Supp. Rev. St. 937, and 2 Supp. Rev. St. 403, whereby the secretary of agriculture was empowered to have made a careful inspection of cattle, sheep, and hogs at slaughter houses located in the several states, which were about to be slaughtered, the products of which were intended for sale in other states or foreign countries, were enacted without any constitutional warrant, and are therefore void.

2. SAME—INSPECTION REGULATIONS.

The rules and regulations made by the secretary of agriculture in pursuance to such statutes, whereby inspectors are appointed and placed in packing houses within the states, to inspect cattle, sheep, and hogs which were about to be slaughtered, or their carcasses when slaughtered, and the products of which were intended for sale in other states or foreign countries, having been made in pursuance of the acts of congress referred to supra, were likewise made without any constitutional warrant, and are therefore void.

3. BRIBERY—OFFICIAL FUNCTIONS.

The crime of bribery cannot be predicated upon the offer of a reward not to perform duties for the performance of which there was no legal or constitutional warrant.

4. INTERSTATE COMMERCE—PACKING-HOUSE OPERATIONS.

Packing houses engaged in slaughtering cattle, sheep, and hogs intended for interstate and foreign markets are not engaged in interstate commerce.

**5. SAME—TRANSPORTATION.**

Interstate commerce is not determined by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but, rather, by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.

**6. POWERS OF CONGRESS—"GENERAL WELFARE CLAUSE."**

The words "to pay the debts and provide for the common defense and general welfare of the United States," found in section 8, art. 1, of the constitution, do not confer any distinct and substantial power on congress to enact any legislation. The generally received opinion is that they constitute a restriction upon the taxing power contained in that section and article, confining the power to lay and collect taxes, duties, imposts, and excises for the purposes specified, namely, "to pay the debts and provide for the common defense and general welfare of the United States."

Demurrer to an Indictment against Harry Boyer for Bribery.

John R. Walker, Dist. Atty., for the United States.

Lathrop, Morrow, Fox & Moore, for defendant.

ROGERS, District Judge. The defendant, Harry Boyer, is indicted for the crime of bribery, based on section 5451 of the Revised Statutes of the United States, which is the general statute creating and punishing the crime of bribery, and reads as follows:

"Every person who promises, offers, or gives, or causes or procures to be promised, offered, or given, any money or other thing of value, or makes or tenders any contract, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, to any officer of the United States, or to any person acting for or on behalf of the United States in any official function, under or by authority of any department or office of the government thereof, or to any officer or person acting for or on behalf of either house of congress, or of any committee of either house, or both houses thereof, with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence him to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be punished as prescribed in the preceding section."

The indictment is in three counts. In the first count he is indicted for attempting to bribe Leslie J. Allen, an assistant inspector in the bureau of animal industry; and in the second count he is indicted for attempting to bribe Frederick William Hopkins, an assistant inspector in the bureau of animal industry; and in the third count he is indicted for attempting to bribe Don W. Patton, assistant inspector in the bureau of animal industry. In other respects the counts are the same. No notice, therefore, will be taken of the second or third counts, as the ruling on the first will cover the second and third.

The first count in the indictment is as follows:

"The grand jurors of the United States of America, duly chosen, selected, impaneled, sworn, and charged to inquire of and concerning crimes and offenses in the Western division of the Western district of Missouri, on their oaths present and charge that at the Western division of the Western district of Missouri, on or about the 21st day of April, 1897, the Jacob Dold Packing Company was a corporation duly created and existing according to law, and was engaged in the slaughtering and packing of cattle, sheep, and hogs, which were the sub-

jects of interstate commerce; that is to say, were engaged in slaughtering cattle, sheep, and hogs, the carcasses and products of which were to be transported and sold for human consumption in other states and territories. And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that on or about the 21st day of April, 1897, at the said Western division of the Western district of Missouri, one Leslie J. Allen was an officer of the United States, and a person acting for and on behalf of the said United States; that is to say, was an assistant inspector in the bureau of animal industry, he, the said Leslie J. Allen, having prior to that time been appointed by the then secretary of agriculture as such assistant inspector in the bureau of animal industry, and he, the said Leslie J. Allen, as such assistant inspector, was on or about the said 21st day of April, 1897, at the said Western division of the Western district of Missouri, stationed at the packing house of the said Jacob Dold Packing Company; and it became and was the duty of the said Leslie J. Allen, as such assistant inspector and officer of the United States, and acting for and on behalf of the United States, to make a post mortem examination of the carcasses of all cattle, sheep, and hogs to be prepared for human consumption at the packing house of the said Jacob Dold Packing Company, as aforesaid, which said carcasses of said cattle, sheep, and hogs were intended to be transported and sold for human consumption in other states and territories; and it became and was the duty of the said Leslie J. Allen, as such officer and inspector as aforesaid, on the said post mortem examination of the carcasses of cattle, sheep, and hogs, as aforesaid, if he found any of said carcasses to be diseased and unfit for human food, to mark the said carcass with a yellow condemnation tag; and it became and was the duty of the said Leslie J. Allen, as such officer and inspector, as aforesaid, to supervise the removal of such condemned carcass or carcasses to a tank or tanks on the premises of said Jacob Dold Packing Company, and see said carcass or carcasses deposited in said tank or tanks and rendered in such manner as to prevent its withdrawal as a food product. And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that at the said Western division of the Western district of Missouri, on or about the said 21st day of April, 1897, there were certain carcasses of cattle at the packing house of the said Jacob Dold Packing Company which had been condemned; and one Harry Boyer, well knowing the premises, and well knowing the duty of the said Leslie J. Allen as such inspector and officer of the United States, as aforesaid, and person acting for and on behalf of the said United States in the inspection and supervision of the removal and rendering of the carcasses of condemned animals as aforesaid, unlawfully, wickedly, and corruptly devising, contriving, and intending to tempt, seduce, bribe, and corrupt the said Leslie J. Allen, so being an inspector and officer of the United States, as aforesaid, and person acting, as aforesaid, for and on behalf of the said United States, to prostitute, abuse, and betray his trust and violate his duty as such inspector and officer, as aforesaid, did unlawfully, wickedly, feloniously, and corruptly offer to give a large sum of money to the said Leslie J. Allen, as such inspector and officer as aforesaid; that is to say, did unlawfully, wickedly, feloniously, and corruptly offer to pay to the said Leslie J. Allen, as such inspector and officer as aforesaid, a stipulated salary per month, in order thereby corruptly to influence, induce, persuade, and bribe him, the said Leslie J. Allen, as such inspector and officer, as aforesaid, in his capacity and character as such United States officer and inspector in the bureau of animal industry, and person acting for and on behalf of the said United States, to agree and consent that the condemned carcasses of cattle intended for transportation, and to be sold as food in other states and territories, might be made into sausage and other food products, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States."

The defendant, Harry Boyer, interposed a demurrer, which is as follows:

"First. For the reason that said first count does not state facts constituting a crime, misdemeanor, or offense under the constitution, statutes, and laws of the United States. Second. Said defendant further demurs to said first count for the reason that the matters and things therein set forth do not show or state that the carcasses or cattle therein mentioned were the subjects of interstate

commerce, nor that the said Leslie J. Allen, therein referred to, was an officer of the United States, or a person acting for or on behalf of the United States in any official function, nor that there was any intent or effort made by this defendant to influence the decision or action of the said Leslie J. Allen on any question, matter, cause, or proceeding which was at any time pending, or which was by law brought before him, in his official capacity, or in his place of trust; nor do said facts allege or show any intent on the part of this defendant to influence said Leslie J. Allen to commit or do, or to collude in or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty."

The point to be decided is whether the indictment charges an offense against the laws of the United States. Has congress the power, under the constitution, to send an inspector into a packing house, located within a state, and impose upon him the duties alleged in the indictment? If it has not, is one guilty of bribery, under the United States statutes, who offers or gives such inspector money to induce him not to perform such alleged duties? The importance of the question is very great. The discussion of the demurrer evinced care, research, and earnest thought by counsel, and the court has given the subject the consideration it deserves. It is a matter of public history that foreign countries have complained of American exportations of diseased meats. To guaranty foreign countries against such products, to promote American commerce therein, and to secure, as far as possible, wholesome food products, congress enacted the legislation whereby the secretary of agriculture was empowered to have made a careful inspection of cattle, sheep, and hogs at slaughter houses, which were about to be slaughtered, the products of which were intended for sale in other states or foreign countries. 1 Supp. Rev. St. 937; 2 Supp. Rev. St. 403. And these inspections were to be made under rules and regulations prescribed by the secretary of agriculture. Id. The inspectors were appointed in pursuance of the statutes referred to supra, and the duties alleged in the indictment prescribed by rules and regulations made in pursuance thereof. The packing houses offered no opposition, if they did not in fact approve and promote the legislation. They applied for the inspectors, presumably, because it enabled them to secure the indorsement of the United States that their goods were sound and wholesome food products. If, therefore, no indictment can be predicated, under the statute, upon the state of facts set forth in the indictment, it is because there was no power in congress to enact the statute; and the result follows that the inspectors may be corrupted with impunity because their presence in the slaughter houses, and the duties they were called upon to perform, were both without any legal warrant, in which event the United States have the alternative left to afford the packing houses the desired indorsement through the medium of inspectors they never had any authority to appoint, or to withdraw them altogether, and leave the subject to state supervision. Narrowed down, the simple question is whether the duties alleged in the indictment, which the inspectors were required, under the rules and regulations of the secretary of agriculture, to perform, were such duties as belonged to the state of Missouri or to the United States.

In McCulloch v. Maryland, 4 Wheat. 405, Chief Justice Marshall said:

"This government [of the United States] is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. The principle is now universally admitted. But the question respecting the extent of the powers actually granted is perpetually arising, and will probably continue to arise as long as our system shall exist."

In Martin v. Hunter's Lessee, 1 Wheat. 326, the same learned jurist stated the same doctrine as follows:

"The government of the United States can claim no powers which are not granted to it by the constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication."

In the elaborate discussion of the principles of the constitution, and the nature and character of the government of the United States, in the Legal Tender Cases, 12 Wall. 457, a good deal is said about the "nonenumerated powers" in the constitution. It is a significant fact, however, that in these cases the court thought it necessary to point out the clause of the constitution where the power to enact the legal-tender statutes was to be found. In these cases, too, as stated in the dissenting opinion of Mr. Justice Field (12 Wall. 638):

"The advocates of the measure do not agree as to the power in the constitution to which it shall be referred; some placing it upon the power to borrow money, some on the coining power, and some on what is termed a 'resulting power' from the general purposes of the government."

That, however, which is most significant, I repeat, is that all the judges sought to find, and did designate, some power or powers to which the legislation shall be referred. However that may be, I do not think it can be fairly said that the court, even in the Legal Tender Cases (decided, as they were, under the strain of a great emergency), intended to go further than had Chief Justice Marshall in McCulloch v. Maryland and Martin v. Hunter's Lessee, supra; and I base this statement upon the following passage in the Legal Tender Cases (page 539):

"Said Chief Justice Marshall, in delivering the opinion of the court [in McCulloch v. Maryland]: 'Let the end be legitimate; let it be within the scope of the constitution; and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.' The case [McCulloch v. Maryland] marks with admirable precision the province of this court. It declares that 'when the law [enacted by congress] is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court [it was said] disclaims all pretensions to such a power.' It is hardly necessary to say that these principles are received with universal assent."

I have quoted this extract from the Legal Tender Cases to show that, in those cases the court approved the principles announced in McCulloch v. Maryland. The question is in no sense involved in the case at bar as to whether the majority of the court in the Legal Tender Cases correctly applied the principles above quoted; but, if it were, it would be indelicate, if not altogether improper, for me to

express an opinion in regard thereto. My duty is to conform to the opinions of that great court, and not to criticise them.

In the Legal Tender Cases the court said, further:

"A decent regard for a co-ordinate branch of the government demands that the judiciary should presume, until the contrary is clearly shown, that there has been no transgression of power by congress, all the members of which act under the obligation of an oath of fidelity to the constitution."

Such seems to be the settled canon of construction. Com. v. Smith, 4 Bin. 123; Fletcher v. Peck, 6 Cranch, 87; Dartmouth College v. Woodward, 4 Wheat. 625; Livingstone v. Moore, 7 Pet. 469; Ogden v. Saunders, 12 Wheat. 294; Knox v. Lee, 12 Wall. 531; Livingston Co. v. Darlington, 101 U. S. 410.

By the tenth amendment to the constitution it is provided that:

"The powers not delegated to the United States, by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

If reasons were required for the principles announced supra, this amendment, it seems, should suffice. We must therefore look to the constitution to find the power for the authority of congress to enact any legislation. Nor will any degree of respect for that great legislative body supply the place of the power if it is not to be found in the constitution. It need not be found in any one power, but if "nonenumerated," or a "resulting power," flowing from the general purposes of the government, still it must be found somewhere in the constitution, or it does not exist and should not be claimed. Hence, Chief Justice Marshall said, in McCulloch v. Maryland, supra:

"Should congress, in the execution of its powers, adopt measures which are prohibited by the constitution, or should congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say such an act was not the law of the land."

Bearing in mind the principles announced, I proceed to consider the question at bar, viz. whether the duties alleged in the indictment, which the inspectors were required, under the rules and regulations of the secretary of agriculture, to perform, were such as belonged to the United States, or to the state of Missouri. Under what clause or provision of the constitution did congress enact the legislation authorizing the inspection of meats, or cattle, hogs, and sheep, or their carcasses, while or before being slaughtered in slaughter houses within a state? The learned counsel for the United States suggests, in argument, that the power may be found under what is commonly called the "general welfare clause." The mention of the "general welfare" is first found in the preamble to the constitution, which may be properly referred to for the purpose of correctly construing that instrument; but I venture the opinion that no adjudicated case can be cited which traces to the preamble the power to enact any statute.

Mr. Justice Story, in his work on the Constitution (section 462), says:

"And here we must guard ourselves against an error which is too often allowed to creep into the discussions upon this subject. The preamble never can be

resorted to, to enlarge the powers confided to the general government, or any of its departments. It cannot confer any power per se. It can never amount, by implication, to an enlargement of any power expressly given. It can never be the legitimate source of any implied power, when otherwise withdrawn from the constitution. Its true office is to expound the nature and extent and application of the powers actually conferred by the constitution, and not substantively to create them. For example, the preamble declares one object to be 'to provide for the common defense.' No one can doubt that this does not enlarge the powers of congress to pass any measures which they may deem useful for the common defense. But suppose the terms of a given power admit of two constructions,—the one more restrictive, the other more liberal,—and each of them is consistent with the words, but is and ought to be governed by the intent, of the power; if one would promote, and the other defeat, the common defense, ought not the former, upon the soundest principles of interpretation, to be adopted? Are we at liberty, upon any principles of reason or common sense, to adopt a restrictive meaning which will defeat an avowed object of the constitution, when another equally natural and more appropriate to the object is before us? Would not this be to destroy an instrument by a measure of its words, which that instrument itself repudiates?'

But the "general welfare clause" to which the learned counsel doubtless referred is found in section 8, art. 1, of the constitution, and is as follows:

"The congress shall have power: (1) To lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts, and excises, shall be uniform throughout the United States."

Mr. Justice Story, in the same elaborate work (sections 907 and 908), says of this provision:

"Before proceeding to consider the nature and extent of the power conferred by this clause, and the reasons on which it is founded, it seems necessary to settle the grammatical construction of the clause, and to ascertain its true reading. Do the words 'to lay and collect taxes, duties, imposts, and excises' constitute a distinct, substantial power; and the words 'to pay the debts and provide for the common defense and general welfare of the United States' constitute another distinct and substantial power? Or are the latter words connected with the former, so as to constitute a qualification upon them? This has been a topic of political controversy, and has furnished abundant materials for popular declamation and alarm. If the former be the true interpretation, then it is obvious that, under color of the generality of the words 'and provide for the common defense and general welfare,' the government of the United States is, in reality, a government of general and unlimited powers, notwithstanding the subsequent enumeration of specific powers. If the latter be the true construction, then the power of taxation only is given by the clause, and it is limited to objects of a national character, 'to pay the debts and provide for the common defense and the general welfare.' The former opinion has been maintained by some minds of great ingenuity and liberality of views. The latter has been the generally received sense of the nation, and seems supported by reasoning at once solid and impregnable. The reading, therefore, which will be maintained in these commentaries, is that which makes the latter words a qualification of the former; and this will be best illustrated by supplying the words which are necessarily to be understood in this interpretation. They will then stand thus: 'The congress shall have power to lay and collect taxes, duties, imposts, and excises, in order to pay the debts, and to provide for the common defense and general welfare of the United States;' that is, for the purpose of paying the public debts, and providing for the common defense and general welfare of the United States. In this sense, congress has not an unlimited power of taxation; but it is limited to specific objects,—the payment of the public debts, and providing for the common defense and general welfare. A tax, therefore, laid by congress for neither of these objects, would be unconstitutional, as an excess of its legislative authority."

After a most elaborate and historical discussion of the subject, presenting the different views of the different political schools or parties, he concludes that the "general welfare" clause "contains no grant of power whatsoever, but it is a mere expression of the ends and purposes to be effected by the preceding power of taxation." Id. § 911. I content myself with the fact that the former construction has never been sustained by any court, and the reverse has been held so often as not to require citations to support it; while the latter construction rests upon the theory that the "general welfare" clause contains no power of itself to enact any legislation, but, on the contrary, the words "and provide for the common defense and general welfare of the United States," according to the most liberal constructionist, is a limitation on the taxing power of the United States, and that only.

No case has been cited tracing the power to enact any statute to the general welfare clause above quoted, and I do not believe any can be. The learned counsel, in this connection, has cited various acts of congress of a nature quite similar to the one in question, but no number of statutes or infractions of the constitution, however numerous, can be permitted to import a power into the constitution which does not exist, or to furnish a construction not warranted. They, too, must stand or fall, when brought in question, by the same principles which are to be applied alike in all cases.

It has been suggested that the "commerce clause" may warrant the enactment of the statute under consideration. Manifestly, I think, the statute was enacted upon the theory that such was the case. That such is not the case, I think, there is no reasonable doubt. That clause reads as follows: "The congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." What is commerce? Is it manufacturing? Is slaughtering cattle and sheep and hogs commerce? If so, why is not farming, or stock raising, or manufacturing lumber, or mining? for all these enter into commerce, both domestic and foreign, and are intended for both.

In Gibbons v. Ogden, 9 Wheat. 1, Chief Justice Marshall said:

"Commerce, undoubtedly, is traffic, but it is something more. It is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

But what commerce or intercourse is it that congress has the power to regulate? It is "commerce with foreign nations, among the several states, and with the Indian tribes." No power is here given to regulate, or prescribe rules for regulating, commerce or intercourse among the citizens of a state. Does the power, then, "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes," embrace the power to send inspectors within a state to inspect animals being slaughtered, the product of which is intended for foreign markets? Nobody contends that congress has any power to regulate commerce within a state. That it has not is universally admitted. When, then, does commerce

become interstate commerce? That question has gone before the supreme court of the United States many times, and in many forms. Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, is a case in which the state of Iowa passed a law prohibiting the manufacture or keeping of intoxicating liquors within that state except for mechanical, medicinal, culinary, and sacramental purposes. Kidd manufactured liquors not intended for the purposes stated, but exclusively for exportation to states in which the sales of liquors were not prohibited. He was indicted therefor, convicted, and the case was affirmed by the supreme court of Iowa. Writ of error was sued out to the supreme court of the United States, and the first question presented was whether the Iowa statute was in conflict with section 8, art. 1, of the constitution of the United States, by attempting to regulate commerce between the states. Mr. Justice Lamar delivered the opinion of the court, quoting approvingly from Gibbons v. Ogden, supra, and used these words:

"The genius and character of the whole government seems to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally, but not to those which are completely within a particular state, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself."

Continuing, Mr. Justice Lamar said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation,—the fashioning of raw materials into a change of form for use. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation, at least, of such, transportation. The legal definition of the term as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702, is as follows: 'Commerce with foreign nations and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufacture, but also agriculture, horticulture, stock raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in congress, and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which in their nature are, and must be, local in all the details of their successful management. It is not necessary to enlarge on, but only to suggest, the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details."

Justice Lamar, continuing, said:

"We have seen that whether a state, in the exercise of its undisputed power of local administration, can enact a statute prohibiting within its

85 F.—28

limits the manufacture of intoxicating liquors, except for certain purposes, is not any longer an open question before this court. Is that right to be overthrown by the fact that the manufacturer intends to export the liquors when made? Does the statute, in omitting to except from its operation the manufacture of intoxicating liquors within the limits of the state for export, constitute an unauthorized interference with the power given to congress to regulate commerce? These questions are well answered in the language of the court in the License Tax Cases, 5 Wall. 462, 470: 'Over this commerce and trade [the internal commerce and domestic trade of the states] congress has no power of regulation, nor any direct control. This power belongs exclusively to the states. No interference by congress with the business of citizens transacted within a state is warranted by the constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature. The power to authorize a business within a state is plainly repugnant to the exclusive power of the state over the same subject.' The manufacture of intoxicating liquors in a state is none the less a business within that state because the manufacturer intends, at his convenience, to export such liquors to foreign countries or to other states. This court has already decided that the fact that an article was manufactured for export to another state does not of itself make it an article of interstate commerce, within the meaning of section 8; art. 1, of the constitution, and that the intent of the manufacturer does not determine the time when the article or product passes from the control of the state and belongs to commerce,"—citing Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475.

Quoting from Coe v. Errol, supra, delivered by Mr. Justice Bradley, he says:

" 'There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation; and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination.' "

Quoting also from The Daniel Ball, 10 Wall. 557, he says:

" 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other."

In Covington & C. Bridge Co. v. Kentucky, 154 U. S. 210, 14 Sup. Ct. 1087, Mr. Justice Brown said:

"Congress has no power to interfere with police regulations relating exclusively to the internal trade of the states (U. S. v. Dewitt, 9 Wall. 41; Patterson v. Kentucky, 97 U. S. 501); nor can it, by exacting a tax for carrying on a certain business, thereby authorize such business to be carried on within the limits of a state (License Tax Cases, 5 Wall. 462, 470, 471). The remarks of the chief justice in this case contain the substance of the whole doctrine: 'Over this [the internal] commerce and trade, congress has no power of regulation, nor any direct control. This power belongs exclusively to the states. No interference by congress with the business of citizens transacted within a state is warranted by the constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature. The power to authorize a business within a state is plainly repugnant to the exclusive power of the state over the same subject.' "

In U. S. v. E. C. Knight Co., 156 U. S. 9, 15 Sup. Ct. 249, Mr. Chief Justice Fuller, delivering the opinion of the court, at page 14, 156 U. S., and pages 254, 255, 15 Sup. Ct., quotes approvingly from Kidd v. Pearson, supra, Gibbons v. Ogden, supra, and Brown v. Maryland, 12 Wheat. 419, and says:

"It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed; for, while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the states as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality."

Cases on this point might be multiplied almost indefinitely, and from them I cite License Tax Cases, 5 Wall. 470; U. S. v. Dewitt, 9 Wall. 41; Patterson v. Kentucky, 97 U. S. 501; Covington & C. Bridge Co. v. Kentucky, 154 U. S. 210, 14 Sup. Ct. 1087; Tennessee v. Davis, 100 U. S. 300; Sands v. Improvement Co., 123 U. S. 295, 8 Sup. Ct. 113; Royall v. Virginia, 116 U. S. 577, 6 Sup. Ct. 510; The Daniel Ball, 10 Wall. 557; Kidd v. Pearson, 128 U. S. 23, 9 Sup. Ct. 6; U. S. v. E. C. Knight Co., 156 U. S. 13, 15 Sup. Ct. 249; In re Greene, 52 Fed. 104, 119; Slaughter-House Cases, 16 Wall. 36; U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540.

From these authorities it follows that:

"When the [interstate] commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. At that time the power and regulating authority of the state ceases, and that of congress attaches and continues, until it has reached another state, and become mingled with the general mass of the property in the latter state. That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured prior to the commencement of the actual transfer or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of congress." In re Greene, 52 Fed. 113.

The Jacob Dold Packing Company, therefore, while engaged in slaughtering and packing cattle, sheep, and hogs within the state of Missouri, the carcasses and products of which they intended to transport and sell for human consumption in other states and territories, or in foreign countries, were not engaged in interstate commerce; and, not being engaged in interstate commerce, their business was in no sense subject to be regulated by congress under the interstate commerce clause of the constitution. The cases which I have quoted sufficiently indicate that the regulations which the secretary of agriculture under the act of congress sought to exercise, and which are alleged in the indictment, are clearly and exclusively lodged in the state of Missouri, and not in the government of the United States; but what has been said may be supplemented by the language of Chief Justice Marshall in the great case of Gibbons v. Ogden, supra, as follows:

"That inspection laws may have a remote and considerable influence on commerce will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived cannot be admitted. The object of inspection laws is to improve the quality of articles produced by the labor of the country; to fit them for exportation, or, it may be, for

domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces everything within the territory of a state not surrendered to the general government, all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws,' health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, etc., are component parts of this mass. No direct general power over these objects is granted to congress; and, consequently, they remain subject to state legislation. If the legislative power of the Union can reach them, it must be for national purposes. It must be where the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given." Story, Const. § 1070.

It has not been suggested that the legislation under discussion may be traced to any other power found in the constitution, and hence I do not discuss any other power found therein. I think it clear from what has been said that congress has no power, even if it had done so by express legislation, to create the offices of inspectors, and impose upon them, or upon agents appointed in pursuance of law by the heads of departments, the duties alleged in the indictment. And the question now arises, if this be true, whether or not to offer a person a bribe not to do something which no valid law enjoins him to perform is an indictable offense, under the statute.

In Re Greene, 52 Fed. 111, Mr. Justice Jackson, at circuit, made use of this language:

"In the consideration of this indictment, it should be borne in mind that, there are no common-law offenses against the United States; that the federal courts cannot resort to the common law as a source of criminal jurisdiction; that crimes and offenses cognizable under the authority of the United States are such, and only such, as are expressly designated by law; and that congress must define these crimes, fix their punishment, and confer the jurisdiction to try them. U. S. v. Hudson, 7 Cranch, 32; U. S. v. Coolidge, 1 Wheat. 415; U. S. v. Britton, 108 U. S. 199–206, 2 Sup. Ct. 531."

In U. S. v. Gibson, 47 Fed. 833, it was held not to be a crime to offer a bribe to an internal revenue officer of the United States with intent to cause him to enter and burn a distillery. The court quashed the indictment, saying:

"The bribe offered was for an act entirely outside the official function of the officer to whom it is claimed the bribe was offered. * * * The alleged offers cannot be said to have been made to induce the officer to do, or omit to do, any act in violation of his lawful duty."

In that case, had the internal revenue officer burned the distillery, it would have been no offense against the United States. No duty rested upon him to see that the distillery was not burned. Doubtless, if he had burned the distillery, he would have been guilty of arson under the state statutes, but of no offense whatever against the laws of the United States. In the case at bar, had the inspector received the bribe, it would have been no offense against the laws of the United States, for the reason that it was intended to induce him not to do a thing which no valid law of congress imposed upon him to do. It would not have been an infraction of the state law, because no state law imposed upon him the duties alleged in the

indictment; nor was he an officer of the state. I am unable to perceive, by any course of sound reasoning, that the facts alleged in the indictment constitute an offense against the United States; and hence the demurrer should be sustained to each of the three separate counts in the indictment, and the indictment dismissed. It is so ordered.