**BLUNDEN et al. v. UNITED STATES.**

No. 10625.

United States Court of Appeals
Sixth Circuit.

Sept. 13, 1948.

---

[7] See cases cited in footnote 5.

[8] Bethlehem Steel Co. v. Parker, 4 Cir., 163 F.2d 334.

992

George S. Fitzgerald, of Detroit, Mich. (George S. Fitzgerald and Paul B. Mayrand, both of Detroit, Mich., on the brief), for appellants.

Marcus L. Friedman, of Toledo, Ohio (Don C. Miller, of Cleveland, Ohio, and Marcus L. Friedman and Gerald P. Openlander, both of Toledo, Ohio, on the brief), for appellee.

Before HICKS, Chief Judge and Mc-ALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

Appellants, Frank O. Blunden, Rodney B. Pierce annd William J. Laughlin, appeal from judgments against them in the District Court under an information charging them with bribing an employee of the United States in a matter within his official capacity. Section 91, Title 18 U.S.C.A., now 18 U.S.C.A. § 201. The appellants waived indictment, pleaded not guilty to the information and waived a jury trial. The District Judge, after hearing the evidence made a general finding of guilty, no request having been made for a finding of the facts specially, as provided by Rule 23 (c) of Rules of Criminal Procedure, 18 U.S.C.A.

■ Most of the facts are uncontradicted. Others are possibly somewhat uncertain. In the absence of findings of fact by the District Judge, we state them, where supported by the evidence, as those which would support the judgments. American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, 115, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575; Jabczynski v. United States, 7 Cir., 53 F.2d 1014. Stephen Flisek was a civilian employee of the United States Army stationed during the time in question at the Rossford Ordnance Depot near Toledo, Ohio, where he served as the Civilian Chief of the Stock Control Division of the Depot. At the Rossford Depot there were three accounts covering property that came under Flisek's control. One was mission stock which was received for issuance to the United States Army. The second was surplus property. The third included such major items as wheeled vehicles and gun mounts. Mission property was segregated from surplus property. Flisek,

on his own initiative could move mission property from the back-up depots to replenish the stocks at Rossford and could ship such property away from the Rossford Depot to a post or station in the United States or overseas on his own authority and without consulting any one. He had no legal authority to ship out mission property to any one who had no connection with the War Department. Surplus property was in an entirely different category from mission property. Flisek had authority to move surplus property within the confines of the depot but had absolutely no authority to move any surplus property off the depot. Such authority, including the issuance of removal orders, was with the War Assets Administration in Detroit.

In the fall of 1946, Laughlin, acting as a representative of a motor company, came to the Rossford Depot looking for surplus automobiles. He had known Flisek previously in Schenectady, New York. He discussed with Flisek the fact that with the close of the war tremendous surplus property would be moving out of the War Department into the commercial field, stated that he was interested in motors and asked if there would be surplus property at Rossford. Flisek told him there would be as much at Rossford as at any other comparable installation in the country. A week or two later Laughlin returned with Pierce, and the two talked with Flisek, again discussing surplus property and the profits that could be made from its purchase and resale. They stated they had formed a business venture and were interested in getting surplus property out of Rossford in preference to other buyers. Flisek told them that in his position he could earmark certain motors for them and release the motors as surplus for their account, and that he would notify them if and when any surplus property was available. This was not correct. The engines at Rossford were mission property and not surplus property, and in addition, Flisek was not an employee of the War Assets Administration and had no authority to deal with surplus property. Shortly thereafter Blunden accompanied Pierce and Laughlin to Toledo and conferred with Flisek at a hotel after working

hours. The purchase of surplus property was again discussed and it was suggested that the business venture would include Flisek for an equal share of the profits from any of the motors that would be obtained through his efforts. Flisek told them that he was a Civil Service employee and as such was prohibited from dealing with any surplus property, and that his name could not be used in the deal. It was arranged for a relative of Laughlin to act in Flisek's place. Between then and November 21, 1946, numerous meetings were held between Flisek and the appellants in Detroit, and Toledo, at which plans were discussed by which the appellants could obtain motors.

The first deal, on November 21, 1946, involved four carloads containing 623 Ford Jeep motors. Following previous arrangements, the motors were ordered by Flisek to be shipped to the Jacob Rose Company in La Porte, Indiana. Flisek represented to the three appellants that these motors had been earmarked for them from War Assets Administration and that he had been able to bring that about by his position at Rossford, and that billing would follow from War Assets Administration within 90 days. He told them that the original price to War Assets Administration was $47.50 per unit. The billing from War Assets Administration did not follow and Flisek finally told appellants that he could get this contract transferred to the depot from War Assets Administration and in turn could buy this material himself at scrap value under a salvage regulation. These representations were untrue. Flisek first billed Rose at $47.-50 per unit which Rose refused to pay, advising that he would only honor an invoice from War Assets Administration. Flisek wrote Blunden and shortly afterwards Laughlin came and met Flisek in a hotel in Toledo. Flisek arranged to secure forms used by the Finance Department and made out a false bill of lading from the Government to himself. .Following an inspection by Rose of this false billing, the Jacob Rose Company mailed Flisek its check for $28,-110.20, which Flisek deposited in his bank. Flisek in turn checked out the same amount to F. O. Blunden and Associates. F. O.

Blunden and Associates paid Flisek $5,-409.36 by check which was the invoice value of the motors at the scrap billing rate. Flisek did not pay the Government for these four carloads of Jeep engines which were shipped to Jacob Rose.

In talks with the appellants after the November 21st shipment, Flisek told them that he would be able to purchase motors himself through the War Assets Administration. This was not true. The appellants advised him that if he could get any more motors they should be billed directly to F. O. Blunden and Associates in Toledo. In January 1947, Flisek had the transportation division ship and bill three carloads of motors containing 126 Jeep engines and 170 Dodge engines to F. O. Blunden and Associates in Toledo, and called Pierce and told him of the consignment. The shipment was received and later resold by F. O. Blunden and Associates who sent Flisek a check for $13,737.26 payable to him which was to be used by him in paying the Government.

About November 1, 1946, the appellants, at Flisek's request, procured for him a Packard automobile, which was valued at $2,115.74. Pierce paid for it with the understanding that Flisek would repay him from his share of the profits from the engines sent to La Porte, Indiana. Following the completion of that deal, Flisek was told that his share of the profits was about $2,800, the greater portion of which was used to pay for the Packard. Pierce paid Flisek a balance of $700 in cash. Flisek also received the payments of $5,409.36 and $13,637.26 above referred to, and additional payments of $6,100 and $5,675.46 as his share of the profits from the transaction, totalling $31,522.08, in addition to the Packard automobile.

The information consisting of three counts, and following the language of the statute, charged Blunden, Pierce and Laughlin with giving to Flisek, knowing him to be an employee of the United States of America, certain things of value with the intent to influence his decision or action in a matter or proceeding within his jurisdiction and control in his official capacity as

the Civilian Chief of the Stock Control Division of the Rossford Ordnance Depot in Wood County, Ohio; the first count dealing with the sale of 126 Jeep engines on January 21, 1947, the second count dealing with the sale of 170 Dodge engines on January 21, 1947, and the third count dealing with the sale of 623 Ford Jeep engine assemblies on or about November 15, 1946. A careful reading of the information shows that it did not charge the appellants with the *intent* to influence Flisek to commit a fraud on the United States or to make the opportunity for the commission of such a fraud, although such additional offense is included within the terms of the statute. Following the close of the Government's case, which included the testimony of Flisek and statements of the three appellants made to FBI agents, the appellants moved for a judgment of acquittal, which the District Judge overruled. Without offering any testimony in their own behalf, the appellants closed the case and renewed their motion for a judgment of acquittal. This motion was later overruled at which time the District Judge found the appellants guilty as charged on the three counts of the information. Judgment was entered against each defendant for a period of three years on each count to be served concurrently, together with a $7,500 fine against each defendant.

■ The construction of the applicable statute, § 91, now § 201, Title 18 U.S.C.A., seems well settled in this jurisdiction. In United States v. Birdsall, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930, the Court held that every action of a person acting on behalf of the United States that is within the range of his official duty comes within the purview of the section; that to constitute it official action it is not necessary that it be prescribed by statute, but it is sufficient that it be governed by a lawful requirement of the department under whose authority the officer is acting; and that it is not necessary that the requirement should be prescribed by a written rule or regulation. In Rembrandt v. United States, 6 Cir., 281 F. 122, this Court held that the statute refers not merely to influencing a decision on any

question, but also to influencing action on any matter, and that the statute was applicable to a situation where the advice and recommendation of the Government employee involved would be influential in securing the decision desired by the persons offering the bribe, even though the employee did not have the authority to make the final ruling. To the same effect is Browne v. United States, 6 Cir., 290 F. 870, and Cohen v. United States, 6 Cir., 294 F. 488, which two cases also held that in order for the offense to exist under the statute it was necessary that the person offering the bribe believe that the employee had the necessary authority and also that the employee possess the actual authority to act or assist in the matter. Opposing counsel appear to agree that the rulings in the foregoing cases are controlling in this matter. The crux of the offense is the intent to influence an *official* decision. The statute requires that the employee be acting for the Government in an "official function" and that the matter in which his decision is to be influenced be "before him in his official capacity."

■ We do not have the assistance of any opinion or discussion by the District Judge of the question involved, and accordingly are not advised of the reasons for the ruling now under review. But under the foregoing construction of the statute we are of the opinion that appellants' motion for a judgment of acquittal should have been sustained. There is no question about the fact that the appellants delivered to Flisek the Packard automobile and over $31,000 to secure a priority or improper advantage over other purchasers of surplus Government property. But Flisek had no authority to give or even recommend the priority or advantage which the appellants sought. There is no question in our minds of the fact that the appellants intended to corrupt a Government employee. But the issue is, was it bribery within the provisions of Section 91, now § 201, Title 18 U.S. C.A.? What Flisek did in furtherance of the scheme between him and appellants was to defraud the Government in a matter in which he had no official duty or authority. The facts are that the appellants were seek-

ing to purchase, although through improper methods, surplus Government property. Their negotiations with Flisek dealt with surplus Government property. Flisek at all times advised them that they were buying, or acquiring, surplus Government property. The record is equally as clear that Flisek had no authority with respect to the disposal of surplus Government property. Although he had authority to ship mission property out of the Depot, he had no authority to ship it to anyone not connected with the War Department, and neither he nor anyone at the Depot had authority to sell mission property. What Flisek actually did in the matter was not to make a decision or recommendation favorable to the appellants in a matter under his jurisdiction, in exchange for the money involved, but to illegally obtain the property from the Government, and turn it over to the appellants for resale and for a division of the profits. He has been indicted and convicted of stealing property of the United States, being the automobile motors involved in these transactions. In his own testimony, introduced by the Government, he testified that he obtained the property illegally, that he has pleaded guilty to having stolen Government property, and that he did not pay the Government for the property so illegally disposed of by him. We believe the situation is very similar to those discussed in United States v. Gibson, D.C., 47 F. 833, and In re Yee Gee, D.C., 83 F. 145, where the illegal act on the part of the Government employee involved was outside the official functions of the employee to whom the bribe was offered. See also United States v. Boyer, D.C., 85 F. 425, 436.

The Government contends that Major Campbell, the Executive Officer at the Rossford Depot, testified that although Flisek was not the acting officer for surplus property, he had operational control over that department. But operational control over surplus property seems to be further defined by him as the authority to move surplus property in various warehouses to a central point within the Depot, at which time it passed out of Flisek's jurisdiction into the jurisdiction of the Chief of Transportation. Although Flisek had the opportunity through deception and fraudulent acts to ship out Government property illegally, he still lacked the authority and jurisdiction to act in the matter, the essential element of the offense.

There may or may not be other Federal statutes under which these appellants can be prosecuted, but regardless of that, the provisions of § 91, Title 18 U.S.C.A., now 18 U.S.C.A. § 201, which are relied on by the Government, do not seem broad enough to include the facts of this case.

The judgment of the District Court is reversed and the case remanded with instructions to enter a judgment dismissing the information.