**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Richard COPPOLA,**
**Defendant-Appellant.**

**No. 72–1735.**

United States Court of Appeals,
Tenth Circuit.

June 4, 1973.

Robert J. Roth, U. S. Atty., and James Twitty, Sp. Atty., Dept. of Justice (Roger A. Pauley and Ronald G. Scheraga, Attys., Dept. of Justice, on the brief), for plaintiff-appellee.

Larry E. Benson, Kansas City, Kan., and Patrick J. Hurley, Leavenworth, Kan., for defendant-appellant.

Before HILL and DOYLE, Circuit Judges, and BRATTON, District Judge.

WILLIAM E. DOYLE, Circuit Judge.

The appellant was charged in an indictment with Joe Cordova, Fred John Molina and Natividad Baca [1] with having conspired to murder one Willard Hardaway in connection with a dispute growing out of the alleged failure of Hardaway to deliver a quantity of heroin to appellant in the United States Penitentiary at Leavenworth, Kansas (in violation of 18 U.S.C. § 371). In a second count he was charged with aiding and abetting Cordova, Molina and Baca in the murder of Hardaway, contrary to 18 U.S.C. §§ 2 and 1111. Defendant was tried and was found guilty on March 27, 1972, and was subsequently sentenced to life imprisonment on count 2 and to five years in prison on count 1 (conspiracy). The life sentence was ordered to run consecutively to any sentence which appellant was then serving. The five-year sentence was ordered to run concurrently with the life sentence.[2]

The government's theory was that appellant, an inmate at the United States Penitentiary at Leavenworth, was the major supplier of heroin within the institution. The homicide in question resulted from a dispute, again according to the government's theory, between appellant and Willard Hardaway, the victim, concerning the delivery of the supply of heroin. Coppola had agreed to pay Hardaway $500.00 to smuggle a shipment of heroin into the prison. Hardaway instructed his wife that she would receive a package in the mail and that she should bring the heroin with her to a graduation exercise on August 23, 1968.[3]

Hardaway's wife carried out his instructions. She received the package in the mail and secreted it into the prison. She then divided it into two packages. One package was transferred to Hardaway. The other was delivered to Fred Deering, another inmate, for delivery to Coppola. It was this division of the package which resulted in the homicide. When Deering took the package to Coppola, the latter recognized that half of it was missing and then stated to Deering that Hardaway had "beat him for half of it" but that he "would take care of it." Later Coppola told Deering that he was paying two Chicanos $500.00 and some narcotics to take care of Hardaway. On September 11, 1968, Hardaway was killed in his cell. The murder weapon was a heavy piece of pipe which was discovered shortly thereafter in a trash bag not far from Hardaway's cell.

1. Prior to Coppola's trial, Molina and Baca were allowed to plead guilty to voluntary manslaughter and each was sentenced to ten years' imprisonment. All charges against Cordova were dismissed.

2. Coppola pleaded guilty to a heroin charge growing out of the same general transaction.

3. Hardaway had completed a two-year college course within the prison.

The evidence was amply sufficient to support the convictions and apparently appellant's attorneys recognize this, for the issues posed here involve the trial court's evidentiary rulings together with the conduct of the prosecutors. It is unnecessary therefore to detail the testimony of the various inmates and others inasmuch as there will be occasion for mentioning much of this testimony in relation to the evidentiary and other problems which will be hereinafter discussed.

The alleged errors relied on are, *first,* the introduction of prior statements of the witness William Triplett under the guise of impeachment. *Secondly,* the calling of the witness John Marshall Caifano, notwithstanding that the government knew that he was not going to give testimony and was going to claim his privilege against self-incrimination. Error is predicated upon his claiming the privilege in response to 18 questions. *Third,* the alleged error in allowing the witness Herman to testify as to conversations with codefendants of appellant allegedly long after any conspiracy had terminated. *Fourth,* the failure of the court to issue process for witnesses to testify as to a confession made by an inmate who has since died. *Fifth,* the alleged failure of the prosecution to disclose at the pretrial omnibus hearing the nature of the testimony of the informers. *Sixth,* the failure of the court to include lesser included offenses. *Seventh,* failure to grant a continuance. It is unnecessary to take up points fifth, sixth and seventh in view of our rulings on the other points and our view of the comments of the prosecutors.

## I.

## THE GOVERNMENT'S ATTEMPT TO IMPEACH THE WITNESS TRIPLETT

One of the main witnesses on behalf of the government was William Triplett who, like the defendant, was an inmate at Leavenworth prison. This witness had been interviewed by the FBI soon after the incident in question and his statements had been reduced to writing and incorporated into the investigative report but were not, of course, signed. On the eve of the trial Triplett signed an affidavit in which he formally repudiated the statements which he had theretofore made. However, some six months before that he had also repudiated his statements. Therefore, the government attorneys were fully aware that he did not intend to testify in accordance with his prior statements. They may have had some hope that he might relent once he took the stand, but as it turned out this was unfounded and Triplett furnished nothing. Nevertheless, the government managed to bring his prior statements to the attention of the jury by asking questions which in toto included a reading of the entire statement.[4] It was not therefore

---

4. The following excerpts from Triplett's ex parte statements to the FBI were introduced. Each of the paragraphs shown was included in a single question.

"It was common knowledge among the inmates of U.S.P.L. that Frank Richard Coppola's associates such as Freddie Deering, Warren Smith, and Courtney Taylor, were involved in a narcotics trade in Leavenworth, and that Marie Hardaway brought into the penitentiary two packages the approximate size of a cigarette package containing $5,000.00 worth of heroin at Willard Hardaway's U.S.P.L. inmate graduation."

\* \* \* \* \*

"Willard Hardaway apparently tampered with the packages which he gave to Coppola. The package Hardaway gave to Coppola did not contain the right amount of heroin, and Coppola told Freddie Deering and Warren Smith that it was short. Triplett overheard this conversation."

\* \* \* \* \*

"At approximately 6 p. m. three or four days after Hardaway's college graduation at U.S.P.L. which took place during late August or early September, 1968, Triplett met Coppola in front of Coppola's cell. Triplett was going to borrow some money from Coppola, and Coppola said that he had some money

a case in which Triplett was called as a witness and gave positive testimony damaging to the government and did so contrary to the reasonable expectations of the government. Rather, he had given prior notice to the government attorneys that his statements to the FBI were not true and that he was not going to testify in accordance with them. Nevertheless, the government started out by asking him about his prior statement.[5] At the outset the trial court showed concern about this procedure, noting the necessity for showing surprise and also questioning whether surprise could in fact be shown.

The trial court instructed government counsel to proceed in the usual way, meaning to ask questions seeking to get the desired information before attempting to impeach. The government counsel started to comply with this. The next question to Triplett was as to his knowledge of the homicide; but after this first question he again reverted to his original method of asking Triplett whether he had made a prior statement and then reading the entire statement to him.

At common law a party was not allowed to impeach his own witness.[6]

The party who called the witness vouched for him, and if he should refuse to testify as expected the testimony given was binding. *See* Crago v. State, 28 Wyo. 223, 202 P. 1099 (1922) (Blume, J.). The first breakthrough, according to Justice Blume, occurred about the middle of the Nineteenth Century and this exception allowed an examiner in some instances to propound leading questions for the purpose of refreshing the witness' recollection. Legislation was enacted in many of the states which provided for examining the witness to refresh his recollection and permitting proof of previous statements made out of court under certain conditions. However, the proof of extrajudicial statements for the purpose of impeachment was extraordinary, and when impeachment was allowed it was only for the purpose of neutralizing the unexpected testimony which he had given on the stand. Never, however, could this be done by attacking the general character of a witness. Therefore, impeachment of one's own witness has been and is now allowed only for the purpose of alleviating the harshness of subjecting a party to the mercy of a witness who has been unscrupulously tampered with by

and papers, that is, packages of heroin. Coppola wanted Triplett to stash, hold these items for him."

\* \* \* \* \*

"Coppola gave to Triplett a $20.00 bill and a $10.00 bill in the presence of Freddie Deering who came out onto the range after making coffee in his cell. Triplett took the money and papers Coppola had given him and put them in his pocket. He then left Coppola's cell. When he reached the end of the range, Coppola called to him. Deering had left by this time and Coppola came down to Triplett at the far end of the range, that is the opposite side from where the stairs are located. Coppola asked Triplett if he had a good place to stash the money and heroin, and Triplett told him that he did. Triplett was told by Coppola that he could keep the whole thing, that is, the money and heroin, and that all he had to do was to knock the son of a bitch's brains out. Triplett said that he did not understand what Coppola was talking about. Cop-

pola asked him if he knew Hardaway, the loan shark. Triplett said he did, and Coppola said all he had to do to keep the money and heroin was to knock Hardaway's brains out. Triplett said he wouldn't do this, but he would stash the money and heroin."

\* \* \* \* \*

"About two hours later Coppola came to Triplett's cell and told him to forget about what he had said about Hardaway, and that the matter was settled. He was told to just forget about it."

\* \* \* \* \*

"No more than 48 hours later Hardaway was bludgeoned in his cell and subsequently died."

5. The trial judge's concern was expressed in this statement:

"What is this about now? This man is a government witness, and you are impeaching him before you ask any questions."

6. McCormick, Law of Evidence § 38 (1954).

an adversary. But even this does not furnish an occasion for the *wholesale* introduction of out of court statements, statements which are hearsay and which could be confused by the jury and considered as substantive evidence. *See* 3A Wigmore, Evidence §§ 906, 1018 (Chadbourn rev. 1970). The authorities recognize the danger of allowing prior statements to be freely introduced because of the difficulty of distinguishing between impeachment and substantive evidence. Inasmuch as the only purpose of impeachment is to neutralize the damaging testimony given, the impeaching evidence should be carefully restricted to compensating for the injury inflicted. *See* Wigmore, *supra*, § 1018, and see the legion of authorities cited in the Note following § 1018, *supra*. *See also* United States v. Dobbs, 448 F.2d 1262 (5th Cir. 1971); United States v. Miles, 413 F.2d 34 (3d Cir. 1969). That it is reversible error to refuse to properly instruct the jury even in a case of justified impeachment is held in United States v. Lipscomb, 425 F.2d 226 (6th Cir. 1970). *See also* Brooks v. United States, 309 F.2d 580 (10th Cir. 1962).

■ It is clear from the above that positive damage and surprise to the party calling the witness are requisite. It is also clear that the testimony here was limited to the witness' assertion that his prior statement made to the FBI was false. In his words it was "prefabricated." The assertion that the statement was false, even if it be regarded as having some damaging aspect, could not possibly justify the introduction of the entire statement. The mischief could have been cured and the effect neutralized by much less of a showing.

■■ As to surprise, we do not say that this requirement is lacking simply because there is prior notice that the witness has changed his story. However, the justification for impeachment is substantially lessened when the party calling a witness knows that he intends to repudiate his prior statement and intends to refuse to testify; and, he is still limited by the requirement that the witness shall have damaged his case. *See* United States v. Dunmore, 446 F.2d 1214 (8th Cir. 1971); United States v. Johnson, 427 F.2d 957 (5th Cir. 1970); Bushaw v. United States, 353 F.2d 477 (9th Cir. 1965), cert. denied, 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966). And the absolute rule remains that a party is not allowed under the guise of impeachment to bring before the jury an ex parte statement of a witness by calling him to the stand when there is reason to believe that he will refuse to testify and when in fact he does so refuse. The party is bound by his refusal and cannot introduce his prior statement by the expedient of asking him leading questions. *Compare* Kuhn v. United States, 24 F.2d 910, 913 (9th Cir. 1928).

In the case at bar the government knew from the beginning that Triplett was going to deny the truth of his prior statement, for he persisted in this position from the start. Triplett did give some information as to heroin traffic, but declined to answer any question concerning the alleged contract to commit the homicide. As to this, he said that he lacked knowledge. Thus, his failure to testify favorably to the government is negative presentation and did not constitute damage. *See* McCormick, Law of Evidence § 38, at 73 (1954).

■ A careful reading of the entire testimony of Triplett convinces the reader that the impeachment of Triplett was not to undo affirmative damage. Instead, one is impressed that an effort of the government was to bring about damage in order to justify the introduction of prior statements.

The court's cautionary instruction attempting to distinguish between impeachment and substantive use of statements is of no value because, as has been shown, whether Triplett was lying is not relevant. There is obviously no value in calling a witness and proving that he is a liar. On the other hand, the introduction of prior unsworn statements which have not been subjected to

cross-examination in this indirect manner is unquestionably prejudicial.

## II.

THE PERSISTENT QUESTIONING OF THE WITNESS JOHN MARSHALL CAIFANO, NOTWITHSTANDING THAT HE REFUSED TO TESTIFY AND CLAIMED HIS PRIVILEGE AGAINST SELF-INCRIMINATION A TOTAL OF 20 TIMES

The witness Caifano had given a brief statement to the FBI prior to trial and the government had contemplated calling him as a witness. However, immediately before trial they learned that he would refuse to testify in accordance with his statement. The prior statement of this witness did not reveal eye-witness knowledge of the homicide. He had advised the FBI agent who questioned him that on the day of the homicide he had heard a low moaning sound from a cell below his own, and had also heard someone say "get a guard with a stretcher"; he heard the moan almost simultaneously with the sounding of the work bell and he saw no one on the tier who did not belong there. He also stated that the trash bag for the third tier was located outside his cell by the stairs and that inmates normally put trash in it on their way to work and that he saw nothing unusual nor any inmate carrying anything or moving exceptionally fast on the morning of September 11, 1968. When a guard came he followed the guard to Hardaway's cell and saw that Hardaway had been hit on the head.[7]

Questions were asked by the government as to whether the witness knew about the events surrounding the murder—whether he was implicated, whether he was hired to actually do it, or whether he was requested by appellant to arrange for someone to hit Hardaway on the head, or whether he had actually hit him on the head. The scope and extent of this questioning are illustrated by Appendix I attached to this opinion. Caifano invoked his Fifth Amendment privilege to all these questions and more.

After the eighteenth question was asked, and following the claim of privilege eighteen times, the judge denied the motion of counsel for appellant for a mistrial, but sustained the objection, ruling that continued questioning of the witness with knowledge that he was going to invoke the Fifth Amendment was improper. Even after this ruling the prosecution asked two additional questions, both of which the witness refused to answer and again claimed his privilege. The record reveals that prior to the trial Caifano's attorney informed both the prosecution and the defense that Caifano would refuse to testify.

---

7. The text of his statement reads:

JOHN MARSHALL, also known as MARSHALL CAIFANO, inmate, United States Penitentiary, Number A83259-L, cell #D301 orderly of the cell house, was advised of the identity of the interviewing agent and of Captain W. W. TUCKER, U. S. Penitentiary.

MARSHALL stated that on August 11, 1968, he left his cell at approximately 6:00 AM and went to breakfast. He returned to his cell after breakfast and took the trash out to the flag which he defined as the floor of the cell house. He returned to his cell prior to the work bell and stayed in his cell where he read the newspaper. He heard a low moaning sound which he thought was coming from below his cell on another tier and went to the door of his cell where he heard someone from the left say, "Get a guard with the stretcher". He stated that he heard the moan almost simultaneously with the work bell as the inmates were walking on the way to work. He stated that everyone he saw on the tier belonged there.

MARSHALL stated that the trash bag for the third tier is located outside his cell by the stairs and that inmates normally put things in it on their way to work. He stated he saw nothing unusual nor any inmate carrying anything or moving exceptionally fast on the morning of September 11, 1968. A guard came up and MARSHALL followed the guard to HARDAWAY's cell and saw that HARDAWAY had been hit in the head.

Also, the prosecution commented in closing argument on the fact that the witness had claimed the privilege. So also did the defense attorney comment on it.

On the motion for new trial appellant argued that it was error for the prosecution to call the witness knowing that he would probably invoke his Fifth Amendment privilege. The trial court found, however, that the government counsel had some basis for believing that Caifano might answer their questions and further found that at no time during the questioning did counsel for appellant object to the questions or request an instruction to the jury.

The judge relied on Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), which upheld the calling of a witness to give him an opportunity to answer questions even though there was prior knowledge that he intended to refuse to answer claiming the Fifth Amendment. In *Namet* the Supreme Court said that the prosecutor need not accept at face value every asserted claim of privilege no matter how frivolous because the privilege is personal and the witness alone must decide whether to exercise it; that the privilege is not a prohibition against inquiry and cannot be effectively raised before the question is asked and is applicable only to particular questions. *See* Marcello v. United States, 196 F.2d 437, 441 (5th Cir. 1952); United States v. Terry, 362 F.2d 914, 917 (6th Cir.), cert. denied, 385 U.S. 1029, 87 S.Ct. 758, 17 L.Ed.2d 676 (1966).

■ The ruling in *Namet* goes no further than to allow the government to call a witness so as to give that witness an opportunity to answer particular questions. It does not stand for allowing the prosecution to ask various and sundry questions which are certain to produce a claim of privilege and to give rise to an atmosphere of guilt. This

was the problem at bar. The witness here, according to the statement which he furnished the FBI, knew nothing about the actual murder and yet he was questioned about a great variety of subjects creating the impression that he might have been an actual participant in some degree or perhaps the principal actor. Yet nothing was produced to support these inferences as to the details of the murder. It left the suspicion that he was implicated but silenced. Accordingly, the conduct of the government comes within that part of the *Namet* opinion which condemns the conscious effort to derive evidentiary value from unfavorable inferences arising from the claiming of the privilege.

In *Namet* the Court acknowledged that each case must be considered on its merits, and it recognized that unfavorable inferences drawn from the claim of privilege are not competent. The number and variety of questions propounded in the case at bar plainly show that the government was seeking to get evidentiary value from the questions and the claims of privilege.[8] This was plainly invalid and prejudicial.

■ It is true that the defendant's objection did not come until after the harm was done and at this late stage the court sustained the objection. But merely sustaining the objection could not cure the misconduct. The problem would not have been eliminated even if the court had gone further and had, at the conclusion of the questioning, instructed the jury to disregard the questions and answers, and even if the court had admonished the jury that they were not at liberty to draw any inference from the questioning on the claims of privilege. However, if the court had given such cautionary instruction even at that late stage, it would have made the problem less aggravated.[9] Since neither instruction nor admonition was given, the

8. *See* Sanders v. United States, 373 F.2d 735 (9th Cir. 1967); Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724 (1964).

9. *See* United States v. Terry, *supra*, at 917 of 362 F.2d and cases cited therein. *See also* United States v. Maloney, 262 F.2d 535 (2d Cir. 1958).

inference arising from the prosecutorial conduct involved and the plain violation of the rules of evidence remained. It is this condition which dictates our conclusion that the goings-on were prejudicial. *Cf.* 86 A.L.R.2d 1435, 1443 (1961).

Moreover, neither counsel should have been allowed to comment in closing arguments on the witness' exercise of the privilege. *See* Courtney v. United States, 390 F.2d 521 (9th Cir.), cert. denied, 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126 (1968) and Rule 513(a) of the proposed Federal Rules of Evidence. Here both sides did it.[10] This added to the unfavorable trial atmosphere.

III.

## THE STATEMENTS OF CO-CONSPIRATORS

One of the witnesses for the prosecution, Killian Joe Herman, also an inmate, testified that he was an orderly in the segregation unit of the prison after the commission of the offense and after appellant and the other alleged co-conspirators were transferred there following the attack.

Appellant here challenges the fact testified to by Herman that he was at the time in question an orderly in the segregation unit, but we need not deal with this dispute.

Herman testified that he delivered heroin during this time from the appellant to both Molina and Cordova, and Herman was allowed to testify as to conversations which he had with Molina and Cordova which he repeated to the appellant.

When the government first attempted to elicit this information from Herman, the objection of the defense was sustained. The government then proceeded to show that Herman had communicated the statements of Molina and Cordova to appellant, and following this showing he was allowed to go ahead and testify as to what Cordova had said to him. He said Cordova "told me that Frank had hired him to get at somebody to kill Mr. Hardaway and he first approached him, wanted him to do it. . . . and then Cordova said that he went ahead and made arrangements with Molina to have him do it." Herman was also allowed to testify over objection as to a statement made to him by Molina. Herman testified as to this: "He [Molina] said he wasn't getting enough stuff. That he wanted all his stuff and he was getting messed around."

Herman further testified to an incriminating statement made to him by the appellant. In this statement appellant was supposed to have said in response to Herman's question as to how he became involved in all this business that he was being cheated by some of his pushers and that he owed Molina $500 and narcotics for "making a con-

10. Defense counsel said:

You recall Mr. Marshall, and Mr. Douthitt testified that he was the gentleman that looked so suspicious to him and that he was standing by that receptacle where the alleged murder weapon was found. And then did you see Mr. Marshall come in here to testify, and what did he say? "I refuse to answer on the grounds it might tend to incriminate me." "Me", not Frank Coppola. And then consider the fair way in which the Government examined him after it being evident to everybody in the courtroom that every question he was asked except his name and address, he would take the Fifth Amendment to. Then and only then did they start asking him questions like,

"Did Frank Coppola do it?" I'm sure if he had been asked if J. Edgar Hoover committed the crime, he would still have taken the Fifth Amendment. (Tr. 734–6).

The prosecution said:

So they make a big issue out of Mr. Marshall. I don't know why Mr. Marshall took the Fifth Amendment, but if he was withholding evidence that was helpful to us, he was—would have been admitting to a crime of a felony, that's why he is taking the Fifth Amendment. He possibly had given statements earlier that we hoped to show, but he wouldn't testify. Why wouldn't he testify? I'll only speculate with you, he *was scared to death, just like the rest of them.* (Tr. 756).

tract to have Hardaway killed." As to this statement of appellant, we see no problem. It was competent as an admission against appellant.

■ It is the statements attributed by Herman to Cordova and Molina which must be ruled incompetent. These conversations stand on a completely different footing from the statement of appellant. They are hearsay and could have been ruled admissible only on the theory that they were made by a conspirator during the continuation of the conspiracy. But the object of the conspiracy, the murder of Hardaway, had been at this time, in November 1968, completed since September and this was the central object of the agreement. The Molina and Cordova statements were made after this object had been carried out. Such statements made long after the conspiracy and not a part of the original transactions or otherwise in furtherance of the conspiracy are inadmissible. Grunewald v. United States, 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed. 2d 931 (1957); Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1949). There is no basis for a finding that appellant embraced these statements either expressly or impliedly.

Since the statements were remote in time from the completion of the object of the conspiracy, they cannot be ruled a part of the original conspiracy. And efforts to superimpose a new conspiracy to conceal the offense or to divide the fruits of the crime are fictional and unavailing. The fact that the defendant was continuing to transfer drugs to Molina and Cordova does not evidence any continuing conspiracy related to the murder, for he had been supplying these two with drugs long before the murder was committed. To hold that the statements are competent would require an unauthorized expansion of the *Krulewitch* and *Grunewald* doctrines. The fact that the statements may have been repeated to appellant in no way cleanses them or changes their character since appellant is not shown to have adopted them as his admissions or to have been

silent when he should have spoken. Accordingly then the two statements retain their hearsay character and it was error for the court to receive them. *See* 4 Wigmore, Evidence § 1071 (3d ed. 1940).

■ Defendant argues that both statements violate the doctrine enunciated in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We disagree. In *Bruton* the Supreme Court held that the reception in evidence of a codefendant's confession violated the constitutional rights of the defendant to confrontation and cross-examination. The limitations of the *Bruton* doctrine are explained in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213 (1970).

In our case we are not concerned with any misuse of a confession. In our case raw hearsay was admitted without the benefit of any exception.

We have taken up this matter in order to avoid any problem on retrial of the case.

## IV.

### THE STATEMENTS AND ARGUMENTS OF THE PROSECUTORS

It is contended that unjustified, unwarranted statements were made by the prosecutors in opening statements, during the trial and in closing arguments. Specific objections now made are

1) referring to the appellant as the heroin king of the penitentiary and to the statement that he had an extensive business that affected many people; that he had many ways of introducing this illegal contraband into the penitentiary;

2) the many references to appellant's involvement with heroin throughout the trial;

3) referring to the defendant as a member of organized crime;

4) commenting on the impeaching questions propounded to Triplett and the reading of his prior answers and the statement that "I think he told the truth

the first time when he told us that he wasn't scared at that time;"

5) referring to appellant as the king of beasts as follows:

This [the penitentiary] is a jungle, ladies and gentlemen, and in every jungle there are beasts, and there's always a king of beasts. But how does he become the king, in a fair fight, that's how he becomes king, in a fair fight. You don't bludgeon a person over the head when he is asleep without giving him a chance. That's how you become king. But in this jungle, that's the way Frank Coppola wanted to become king and to remain king of the heroin traffic, I'm convinced of that.

And the statement in support of the argument for the death penalty:

If Coppola is permitted to survive, he can continue doing what he has been doing and you will be turning him loose back in the prison yard, back at these witnesses who are courageous enough to come back here and to go back and set up his evil crimes again and society is handcuffed and blocked from doing anything about it, from remedying the worse form of cancer, that is the depraved, merciless, cold-blooded killer. Unless this man suffers death, no inmate, and particularly not those who have testified, can ever lead normal, secure, safe lives.

The survivors who are still living have a right to survive. Contracts can be let from prison to the outside as well as the inside of the walls.

 No objection was made to the expressions of personal opinion and to the remarks, and hence these references probably could not furnish a basis for reversal. *See* Devine v. United States, 403 F.2d 93, 96 (10th Cir. 1968), cert. denied, 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969); Van Nattan v. United States, 357 F.2d 161, 163 (10th Cir. 1966). Since, however, the case is to be retried, it is appropriate to point out the impropriety of arguments which are designed primarily to inflame and prejudice rather than to enlighten. Throughout the transcript it is apparent that the government attorney's strategy was primarily to put emphasis on defendant's deep involvement in the heroin traffic. It was proper to show the evidence as to the heroin insofar as it related to the conspiracy to murder and the actual murder. The heroin evidence was, however, emphasized unnecessarily. Also, it is not appropriate for the prosecutor to offer his own opinions as to guilt. This not only violates the canon of ethics, it is invalid, for he is not a witness in the case, he is a representative. *Cf.* Hall v. United States, 419 F.2d 582, 587–588 (5th Cir. 1969); Devine v. United States, *supra*, at 96 of 403 F.2d.

In summary then: insofar as the heroin issue showed motive for the murder it was relevant.

This is such an explosive issue that its presence in a case produces a conviction almost automatically regardless of the depth of the evidence. For this reason, undue and unjustified emphasis must be avoided. Inferences which fairly reflect the record are proper argument. Methods designed to arouse prejudice, passion and use of invective are not proper argument.

## V.

## THE DENIAL OF APPELLANT'S APPLICATION FOR SUBPOENA OF A WITNESS

 We fail to see any error in the refusal of the court to grant an application for a writ of habeas corpus ad testificandum directed to a penitentiary inmate who supposedly would say that one John Lee "Snake" Arnold, another inmate since deceased, had confessed to the killing of Hardaway. The trial court denied the application on the basis of Donnelly v. United States, 228 U.S. 243, 273, 33 S.Ct. 449, 57 L.Ed. 820 (1913).

Without considering the affect that final approval of the Federal Rules of Evidence, particularly Rule 804(b)(4), would have on this question, we conclude

that the trial court was correct in denying this request because apart from the question of its competence as evidence, the court could have easily determined that it was grossly incredible.

\* \* \* \* \* \*

 Because the errors here are substantial we cannot avoid reversing and remanding this case for a new trial. The individual matters discussed above are substantial and, at the same time, are cumulative. Thus, a new trial is essential even though the valid evidence is legally sufficient to show the defendant's guilt. We recognize the difficulties incident to the prosecution of an inmate of a penitentiary, but a separate set of standards applicable to this kind of a prosecution cannot be adopted.

Accordingly, the judgment of the district court is reversed and the cause remanded for a new trial.

### APPENDIX

TESTIMONY OF JOHN MARSHALL

\* \* \* \* \* \*

Q. Do you also have another name, Mr. Marshall?

A. Yeah, the name I was born with is Marshall Caifano.

Q. How do you spell that name?

A. C-a-i-f-a-n-o.

Q. Mr. Caifano, I mean Mr. Marshall, have you been an inmate at the Leavenworth Penitentiary?

A. Yes.

Q. And how long have you been an inmate?

A. About five and a half years.

Q. Were you an inmate on September 11, 1968?

A. Yes, I was an inmate.

Q. Do you remember what cell house you lived in on that day?

A. Well, listen, I want to—

Q. Well, let—

A. I respectfully decline to answer because my answer may be—may tend to make me—on the grounds that my answer may tend to incriminate me.\*

Q. All right. Mr. Caifano, I would like to ask you did you on that day, September 11, 1968, live in Cell D–301?

\* \* \* , \* \* \*

Q. Mr. Marshall, on September 11, 1968, did you know Willard Hardaway?

\* \* \* \* \* \*

Q. On September 11, 1968, or thereabouts, were you acquainted with Frank Coppola?

\* \* \* \* \* \*

Q. On that same date were you a close friend of Mr. Coppola?

\* \* \* \* \* \*

Q. Mr. Marshall, do you know whether or not Mr. Hardaway, Willard Hardaway, was hit in his cell on September 11, 1968?

\* \* \* \* \* \*

Q. Mr. Marshall, I will hand you what has been marked Government's Exhibit No. 22, or I will show it to you, and also Government's Exhibit 23, and I will ask you whether or not you've ever seen either of those exhibits?

\* \* \* \* \* \*

Q. Mr. Marshall, do you know whether or not Government's Exhibit 22, being the steel rod which I just showed you, was found in the trash bag on Tier 3 of Cellhouse D outside your cell on September 11, 1968?

\* \* \* \* \* \*

Q. Now, Mr. Marshall, assuming that Mr. Hardaway was hit on the head with Government's Exhibit 22 on September 11, 1968, somewhere around 7:20 or between 7:20 and 7:30 in the morning of September 11, 1968, do you know who hit him on the head?

\* \* \* \* \* \*

Q. At that same time, being approximately 7:20 to 7:30 on September 11, 1968, did you see anyone in Cell D–311,

---

\* This response was repeated by Marshall to all subsequent questions, and so only the subsequent questions are included.

which is the one Willard Hardaway was in, other than Mr. Hardaway?

\* \* \* \* \* \*

Q. Mr. Marshall, did Frank Coppola hire you or ask you to hit Richard—Willard Hardaway over the head and kill him in his cell?

\* \* \* \* \* \*

Q. Mr. Marshall, did you, at the request of Mr. Coppola, ask anyone to hit Mr. Hardaway over the head?

\* \* \* \* \* \*

Q. Mr. Marshall, did you personally hit Willard Hardaway over the head on September 11, 1968, at approximately 7:20 to 7:30 in the morning?

\* \* \* \* \* \*

Q. Do you know Natividad Baca, a person named Natividad Baca?

\* \* \* \* \* \*

Q. Do you know Fred John Molina?

\* \* \* \* \* \*

Q. Do you know Joe Cordova?

\* \* \* \* \* \*

Q. Now, on September 11, 1968, at approximately 7:20 to 7:30 in the morning, did you see either Natividad Baca, Fred John Molina, or Joe Cordova in Cellhouse D?

\* \* \* \* \* \*

Q. At that same time, being September 11, 1968, at approximately 7:30 in the morning, did you see Fred John Molina leave cell D–311, which is the cell of Willard Hardaway?

\* \* \* \* \* \*

MR. BENSON: Your Honor, may counsel approach the bench?

\* \* \* \* \* \*

THE COURT: Yes, you may.

\* \* \* \* \* \*

THE COURT: I think under the circumstances it is not improper for the United States Attorney to place the witness on the stand and give him an opportunity to answer the questions, assuming that he might not claim his privilege, but I do think that continued questioning along this line now, knowing that he is claiming the Fifth, would be improper.

Objection sustained and the motion for a mistrial will be denied.

(The following proceedings were had in open court in the presence of the jury:)

By Mr. Roth:

Q. Mr. Marshall, do you recall ever being interviewed by any member of the Federal Bureau of Investigation concerning this matter?

\* \* \* \* \* \*

Q. Well, Mr. Marshall, if I continue asking you questions about this matter, no matter what they are, will you continue giving that same answer?

\* \* \* \* \* \*

MR. ROTH: You may cross-examine.

MR. HURLEY: No questions, your Honor.