UNITED STATES of America, Appellee,

v.

Theodore D. MORLANG, Appellant.

No. 74–2071.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1975.

Decided Dec. 30, 1975.

Nathan Lewin, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., and Samuel D. Lopinsky, Charleston, W. Va., on brief), for appellant.

John A. Field, III, U. S. Atty. (Wayne A. Rich, Jr., and Robert B. Allen, Asst. U. S. Attys., on brief), for appellee.

Before BUTZNER and WIDENER, Circuit Judges, and CLARKE, District Judge.*

WIDENER, Circuit Judge:

The appellant, Theodore Morlang, was convicted by a jury on one count of an indictment charging him with conspiracy to bribe and bribery.[1] The indictment was initially returned in seven counts,[2] a number of which were dismissed prior to trial. The appellant was acquitted on the remaining substantive counts of the indictment which charged him with the acts of bribery.

The appellant has raised, through briefs filed by his attorneys, a number of issues regarding the conduct of his trial. These include: (1) Whether the prosecution's refusal to consent to the appellant's waiver of a jury trial denied the appellant an impartial trial; (2) Whether the court erred in permitting the prosecution to present to the jury, for purposes of impeachment, an out-of-court statement, which was a conclusion as to Morlang's guilt, purportedly made by its own witness; (3) Whether the prosecution was erroneously permitted to elicit from its own witness, his conclusion as to the relationship between the appellant and an alleged accomplice, by reading to him from his grand jury testimony; and (4) Whether the court erred in instructing the jury as to the general standards of conduct imposed upon James Haught, an unindicted co-conspirator, as an employee of the Federal Housing Administration. We reverse and remand for a new trial.

The conviction here stems from an alleged bribery scheme involving an FHA insured housing project. In the fall of 1967, the Federal Housing Administration began a drive to encourage the construction of low to moderate income rent-supplement housing projects throughout the United States.[3] Under the law, nonprofit organizations sponsoring the construction of such projects could obtain no-down-payment mortgages that would be 90% insured by the FHA.

James F. Haught,[4] the Director for West Virginia's FHA program, invited lenders, real estate brokers, community officials and other interested individuals—including potential sponsors—to attend a meeting in Charleston, where he described the opportunities available under the plan. One of those in attendance was Fred Wilmoth, an agent for the Prudential Life Insurance Company.[5] Wilmoth was authorized to make long-term loans on behalf of Prudential, and following the meeting, he spoke with Haught. According to Haught, Wilmoth subsequently asked him to travel to Parkersburg, West Virginia to meet with Morlang, who was an area banker and builder in an effort to interest Morlang in participating as a contractor.

---

* United States District Judge for the Eastern District of Virginia, sitting by designation.

1. In the first count, Morlang, along with Fred Wilmoth and Price Ballard, was charged with conspiracy to bribe James Haught, the Director of the Federal Housing Administration of West Virginia and an unindicted co-conspirator, in violation of 18 U.S.C. § 371.

2. The second and fourth counts charged Morlang and Fred Wilmoth with the paying of bribes, $800 and $2000 respectively, in violation of 18 U.S.C. §§ 201(b) and 2. The third and fifth counts charged Morlang and Wilmoth with paying a bribe of $800 and a bribe of $2000 respectively, in violation of 18 U.S.C. §§ 201(f) and 2. The sixth and seventh counts charged Wilmoth alone with uttering false statements to the Department of Housing and Urban Development, in violation of 18 U.S.C. §§ 1010 and 2.

3. The projects, which were referred to as Section 221(d)(3) Housing Projects, featured no-down-payment mortgages and were either limited dividend plans (with 90% FHA funding) or public agency plans (with 100% FHA funding). 12 U.S.C. § 1715*l* (1975).

4. Haught was an unindicted co-conspirator in this action.

5. Wilmoth was also a named defendant in the original indictment charging Morlang. See n. 2. He subsequently pleaded guilty to charges of bribery as alleged in the second and fourth counts of the indictment.

Some time thereafter, Wilmoth and Haught visited Morlang's office in Parkersburg to discuss the substance of the program. According to Haught, the three discussed potential areas of profit, including illegally contrived architectural fees, and concluded that there was "plenty in it for all."[6] They also allegedly agreed that former West Virginia Governor W. W. Barron would have to be taken care of because of his previous assistance and political contacts. Both Wilmoth and Morlang flatly deny that there was ever any discussion in Morlang's presence other than as to the general nature of the federal program.

Seven projects were thereafter launched by Morlang under the FHA plan, one of which was the Hanna Drive development. Price Ballard,[7] a licensed realtor and a corporate officer of Elk Realty Company of Charleston, West Virginia, and former Governor Barron were enlisted as partners in this project. When approval of the development became bogged down in the FHA office in Philadelphia, Haught allegedly solicited a $2000 bribe "to walk it through Philadelphia and again the Washington office." This bribe was purportedly paid by Wilmoth, Barron, Ballard and Morlang, although Wilmoth testified that Morlang was in no way involved.

Haught also testified at trial that approximately three or four months prior to the $2000 bribe being paid, Morlang personally gave him $800 while in the presence of Wilmoth. Both Wilmoth and Morlang deny having any knowledge of the $800 payment being made.

By its verdict of not guilty, the jury indicated that it did not believe beyond a reasonable doubt Haught's story as to either the $800 or $2000 bribes. It did, however, find Morlang guilty on the charge of conspiracy to bribe.

**6.** According to Haught, the three estimated that there would be as much as a million dollars in it for each of them in illegal profits.

**7.** Ballard was an original defendant in this action as well. He entered a plea of nolo contendere to the first, fourth, and fifth counts of the indictment prior to trial. See n. 2.

## I

As to the first issue raised, Morlang contends he was denied a fair trial by the prosecution's refusal to waive a jury trial in view of the pre-trial publicity and the likelihood of prejudice growing out of former Governor Barron's involvement. Prior to trial, he filed a request under FRCrP 23(a)[8] to waive trial by jury. The motion recited the very substantial publicity that the case had received—both from the government's civil suit against Morlang as well as from the criminal charges then pending. In response to this motion, the court noted that the government objected to the request and denied the motion.

Morlang concedes in his brief that he has no absolute constitutional right to a non-jury trial. The Supreme Court, in *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), held that there was "no constitutional impediment to conditioning a waiver of [the right to a trial by jury] on the consent of the prosecuting attorney and the trial judge. . . ." 380 U.S. at 36, 85 S.Ct. at 790. The appellant, however, in pressing his claim, relies upon a caveat laid down by the *Singer* court suggesting that "there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." Id. at 37, 85 S.Ct. at 791.

Based upon the quoted language from *Singer*, Morlang contends that the trial judge erred in disposing of his request for a non-jury trial in two distinct respects: (1) He failed to exercise any discretion in determining whether a non-jury trial would have increased the likelihood of a fair trial, and (2) Even if the court did exercise its

**8.** Rule 23(a) states:

"(a) Trial by Jury. Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."

discretion, it did so in such an erroneous manner as to constitute an abuse of discretion. We do not agree with either assertion.

■ To begin with, the burden was upon the appellant to rebut the presumption of impartiality on the part of prospective jurors. See *Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244 (1878); *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In deciding whether the burden of proof has been carried, a court should be cognizant of the admonition of Chief Justice Marshall, who, in 1807, wrote:

> "[L]ight impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force, do constitute a sufficient objection to him."[9]

Moreover, the conclusion of the trial court upon the issue of impartiality ought not be set aside by a reviewing court unless the error is manifest. *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878); see also *Spies v. Illinois,* 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ A review of the record indicates no error on the trial judge's part, manifest or otherwise, in refusing the appellant's motion. At the time Morlang asked to be tried without a jury, no evidence was offered to establish actual prejudice on the part of any of the prospective jurors. Instead, the appellant merely cited the extensive publicity surrounding the case, arguing that a non-jury trial would, as a result, increase the likelihood of a fair trial.[10]

Yet, the record indicates no substantial likelihood that any of the prospective jurors would have been unfair or biased in rendering their verdict. It is true that five members of the venire, one of whom was ultimately excused, responded in the affirmative when asked by the court:

> Do any of you know anything about this case, that is the case of the United States of America versus Theodore D. Morlang? Have you heard it discussed?

But, when asked if they had any doubt as to their ability to sit as fair and impartial jurors, each indicated that they could decide the case solely on the evidence.

■ Based on the record then, it is clear that the trial court, in examining the prospective jurors, took great care to assure itself that a fair and impartial trial could be had before the jury, and, thus, it properly exercised its discretion before proceeding to trial. Although a number of jurors had heard or read about the 'case, this alone is not a sufficient basis upon which to conclude that the likelihood of a fair trial would be substantially diminished by the use of a jury. As we have noted before, it is not inconceivable that prospective jurors previously exposed to publicity could truthfully answer that they would be unaffected by their recollection. *United States v. Abbott Laboratories,* 505 F.2d 565, 572 (4th Cir. 1974).

---

**9.** 1 Burr's Trial 416, quoted with approval, 366 U.S. at 722, 81 S.Ct. at 1642.

**10.** As the appellant points out, the American Bar Association's *Standards for Fair Trial and Free Press* § 3.3 (1968) state:

> "In those jurisdictions in which the defendant does not have an absolute right to waive a jury in a criminal case, it is recommended that the defendant be permitted to waive whenever it is determined that (1) the waiver has been knowingly and voluntarily made, and (2) there is reason to believe that, as a result of the dissemination of potentially prejudicial material, the waiver is required to increase the likelihood of a fair trial."

While the ABA *Standards* do not say that trials without a jury should be required only when publicity makes a fair trial impossible, even they require at least a showing that a non-jury trial will "increase the likelihood of a fair trial." We do not believe that a mere showing that the case has received extensive press coverage is sufficient to establish the basic fact of increased likelihood of a fair trial.

■ The court pointed out in *Irvin* that "[i]t is not required . . . that . . jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S.Ct. at 1642. Thus, where, as here, the government objects to a defense motion to proceed without a jury, and the defense offers no evidence to establish "reasons" "so compelling that the Government's insistence on trial by jury would result in the denial to the defendant of an impartial trial," *Singer*, 380 U.S. at p. 37, 85 S.Ct. at p. 791, the court is within its discretion in denying the defendant's request. We are of opinion that the district court properly exercised its discretion in its denial of the request. We do not decide if the caveat suggested in *Singer* has validity. We do decide that if it has validity, the facts of this case do not fit within it.

## II

The next issue concerns the prosecution's use of an out-of-court statement which was purportedly made by one of its own witnesses, Fred Wilmoth. Wilmoth was called by the government as its first witness despite the fact that it was fully aware that his testimony would tend to exonerate Morlang from participation in the bribery although damning against Ballard and Barron as well as Wilmoth himself. The real purpose for calling Wilmoth was apparently to elicit from him a denial that he had ever had any conversation with a fellow prisoner in which he implicated Morlang.[11]

Having obtained such a denial, the prosecution called Raymond Crist, the man to whom the out-of-court statement was allegedly made. Crist was, at that time, an inmate at the federal correctional institution at Ashland, Kentucky, and had spent more than half his adult life in prison for a series of convictions extending back to 1941, which included grand larceny, auto theft, breaking and entering, and Dyer Act. The court permitted the testimony of Crist to be introduced only for the purpose of attacking the credibility of Wilmoth.[12]

11. The government freely admits that it was in no way surprised when Wilmoth's testimony did not implicate Morlang.

It is of more than passing interest that the statement attributed to Wilmoth by Crist did not relate to any of the facts of the case, or to the bribes, which are at the heart of the controversy, but was a conclusory statement from which could only be inferred Morlang's guilt. It was: "One of us had to take the rap so the other one could stay out and take care of the business." The "other one" was first identified by Crist as either Morlang or Haught, and immediately following as both of them. Crist testified the statement was made while he and Wilmoth were fellow prisoners in jail.

12. While the government contends that Crist's testimony was proper for the purpose admitted, it asks us to go beyond the district court and hold the statement admissible as substantive evidence, and not merely for purposes of impeachment. It bases its contention on *Unit-

*ed States v. Payne*, 492 F.2d 449 (4th Cir. 1974). We are of opinion that our decision in that case does not support the government's position.

It is true that in *Payne* the unsworn partial statement of a government witness was introduced as substantive evidence following his failure to recall either the events set forth in the statement or the fact of the taking of the statement. Yet, the witness in that case had had an opportunity at an earlier court proceeding to challenge the fact of the interview or what was allegedly discussed. We there noted that the witness' ". . . attention was directed to his statement, . . . he had ample opportunity to disavow the fact of the interview and what was discussed, or to assert his lack of recollection of all or any part of it, and . . . his silence, in the presence of the court [at the previous hearing], amounted to tacit admissions that the interview took place, that he remembered it and that he acknowl-

We are of opinion that the court erred in permitting the prior statement of Wilmoth to be introduced. While it is the rule in this circuit that a party calling a witness does not vouch for his credibility, *United States v. Norman*, 518 F.2d 1176 (4th Cir. 1975), it has never been the rule that a party may call a witness where his testimony is known to be adverse for the purpose of impeaching him. To so hold would permit the government, in the name of impeachment, to present testimony to the jury by indirection which would not otherwise be admissible. The courts have consistently refused to sanction such a practice.

The government, however, urges that the introduction of this testimony was proper under our holding in *United States v. Lineberger*, 444 F.2d 122 (4th Cir. 1971), where, in a per curiam opinion, we noted that some authorities have permitted a defendant under certain circumstances to impeach his own witness.[13] In so doing, we cited Rule 607 of the then proposed Rules of Evidence. That rule provides, "The credibility of a witness may be attacked by any party, including the party calling him."[14] The Federal Rules of Evidence had not been adopted at the time of these proceedings, however, and until such time as they were "the trial court was bound by the decisions on the subject." *Martin and Hankish v. United States*, 528 F.2d 1157 (4th Cir. 1975). To interpret *Lineberger* as allowing the government in a criminal prosecution to set up a straw man in order to impeach him attaches significance to the opinion beyond its holding, which is that if

the district court erred in not allowing impeachment, its error was harmless.

Moreover, whether *Lineberger* should be read in the light of the later case of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which held that the voucher rule as applied to a criminal defendant has constitutional overtones is at least an open question. The court stated in *Chambers* that "[T]he right of cross examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation and helps assure the accuracy of the truth-determining process." 410 U.S. at 295, 93 S.Ct. at 1046. Accordingly, the voucher rule, which was applied so as to prevent the defendant in *Chambers* from impeaching his own witness, was deemed to have interfered with the accused's right to defend himself.

In neither *Lineberger* nor *Chambers*, however, was the witness called for the sole purpose of impeachment. Any constitutional considerations which may have been present in those cases are obviously not involved where the government calls a witness having in mind no other apparent purpose than to elicit from him testimony which may thereafter be impeached. Thus, we must look beyond the holdings of these cases if such a course of conduct is to be justified.

We, of course, recognize that the strict rule against impeaching one's own witness has long been discredited. E. g., *Young v. United States*, 97 F.2d 200 (5th Cir. 1938). It is now generally recognized that impeachment may be resorted to

---

edged the correctness [of its substance]." 492 F.2d at 452.

Here, Wilmoth consistently adhered to the position that Morlang was not involved in the conspiracy. Moreover, Wilmoth had had no opportunity to repudiate the alleged earlier statement in open court. On the basis of these facts, we are unable to conclude that Wilmoth ever acknowledged the correctness of his earlier statement so as to bring it within *Payne*. Thus, if for no other reason, we are of opinion that this portion of the government's argument is without merit. See *United States v. Martin et al.*, 528 F.2d 1157 (4th Cir. 1975).

**13.** See, e. g., *United States v. Freeman*, 302 F.2d 347 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963).

**14.** Whether Rule 607, as adopted, when read in the light of revised Rule 801, would support the government's position as to the propriety of the admission of the testimony in question, we need not decide. These proceedings were "brought" prior to the adoption of the Rules and are not governed by them. P.L. 93–595. As such, we recognize that this opinion may have only limited precedential value depending upon the scope of Rules 607 and 801 as they may be later interpreted by the courts.

where the trial court, in its discretion, determines that it is necessary to alleviate the harshness of subjecting a party to the mercy of a witness who is recalcitrant or who may have been unscrupulously tampered with. *United States v. Coppola,* 479 F.2d 1153 (10th Cir. 1973). The overwhelming weight of authority is, however, that impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible.[15]

Witnesses may, of course, sometimes fail to come up to the expectations of counsel and in such situations there is an understandable temptation to get before the jury any prior statement made by the witness. And it may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony. *Bridges v. Wixon,* 326 U.S. 135, 153–54, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945).

 We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for them to distinguish between impeachment and substantive evidence. Accord *United States v. Coppola,* 479 F.2d 1153 (10th Cir. 1973); *Taylor v. Baltimore & Ohio R. R. Co.,* 344 F.2d 281 (2nd Cir. 1965). Thus, the danger of confusion which arises from the introduction of testimony under circumstances such as are presented here is so great as to upset the

balance and warrant continuation of the rule of exclusion. *Shepard v. United States,* 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

In the instant case, the witness Wilmoth, in statements given to the government, consistently adhered to his story that the appellant was not a participant in the bribery. The prosecution admits this. Thus, the only apparent purpose in calling him was to get before the jury the alleged statement made to Crist. Clearly, the introduction of this testimony was damaging. To permit the government in this case to supply testimony which was a naked conclusion as to Morlang's guilt in the name of impeachment would be tantamount to permitting the use of hearsay and would seriously jeopardize the important policies underlying Justice Douglas' opinion in *Bridges.* Cf. *United States v. Davis,* 487 F.2d 112, 123 (5th Cir. 1973). Despite the fact that impeachment of one's own witness may be permitted, this does not go so far as to permit the use of the rule as a subterfuge to get to the jury evidence otherwise inadmissible.

### III

The third issue raised by the appellant concerns the examination of Price Ballard, a government witness, based upon his prior grand jury testimony. Shortly after the prosecution called Ballard, it began examining him by reading from his grand jury testimony. While it is true, as the government points out, that in the examination of a witness who proves recalcitrant, the latitude permitted the litigants is wholly within the discretion of the trial judge, *Harman v. United States,* 199 F.2d 34 (4th Cir. 1952), here there is no indication that Ballard was, in fact, recalcitrant, evasive or otherwise uncooperative.

 It is, of course, obvious from everyday experience that the latent memory of a

---

15. E. g., *United States v. Coppola,* 479 F.2d 1153 (10th Cir. 1973); *Mississippi v. Durham,* 444 F.2d 152, 156 (5th Cir. 1971); *Doss v. United States,* 431 F.2d 601, 604 (9th Cir. 1970); *Fontaine v. Patterson,* 305 F.2d 124 (5th Cir.

1962); *United States v. Michener,* 152 F.2d 880, 883, n. 3 (3d Cir. 1945); *Young v. United States,* 97 F.2d 200, 205 (5th Cir. 1938); *Kuhn v. United States,* 24 F.2d 910, 913 (9th Cir. 1928).

witness may be revived by prior written statements which he or others may have made. Thus, most courts today hold that in examining a witness at trial, counsel may hand him a memorandum to inspect for the purpose of refreshing his memory, with the result that when he testifies, he does so on the basis of his own recollection, not the writing. See *McCormick, Evidence*, 2nd Ed. § 9. Proper foundation for such procedure requires that the witness' recollection be exhausted. *Goings v. United States*, 377 F.2d 753 (8th Cir. 1967), cert. den. 393 U.S. 883, 89 S.Ct. 191, 21 L.Ed.2d 158 (1968). A contrary holding would permit a party to substitute the prior statement of a witness for his actual testimony. The Supreme Court has considered a similar fact situation and, while holding that the grand jury testimony was used simply to refresh the recollection of the witness, stated ". . . there would be error where under the pretext of refreshing a witness' recollection the prior testimony was introduced as evidence." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940). Here, there was not even a representation the witness' memory needed refreshing; the government took the position it had a right to examine the witness in the manner just described.

The government contends, however, that Rule 801(d)(1)(A) of the Federal Rules of Evidence would permit Ballard's grand jury testimony to be introduced as substantive evidence, and there is no error in examining Ballard in this manner. Rule 801(d)(1)(A), in part, provides: "A statement is not hearsay if . . . the statement is (A) inconsistent with his [the witness'] testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition. . ." As we have before noted, the Federal Rules of Evidence do not govern this trial. But considering them persuasive authority, there is no indication in the record that Ballard's testimony had developed to a point where it could fairly be said that it was inconsistent with his earlier grand jury testimony, so we need decide no more than that the rule would not apply, even if in effect.

We are thus of opinion that Ballard's grand jury testimony was not admissible as offered. *United States v. Socony-Vacuum Oil Co.*, see *Rosenthal v. United States*, 248 F. 684 (8th Cir. 1918) (cited in *Socony-Vacuum*).

IV

Finally, the appellant contends that the court's instruction of the jury relative to the general standards of conduct required of HUD employees as published in the Code of Federal Regulations was improper.[16] These instructions concerned the ethical standards to which Haught was expected to conform as director of the FHA. While we agree with the government that the jury was entitled to know the standard

---

**16.** The regulations relied upon by the trial judge in instructing the jury provide:

"An employee shall not engage in outside employment or other outside activity not compatible with the full and proper discharge of the duties and responsibilities of his Government employment. Incompatible activities include but are not limited to:

"(4) Activities that establish relationships or property interests that may result in a conflict between his private interests and his official duties." 24 CFR § 0.735–204(a)(4). "An employee shall avoid any action whether or not specifically prohibited by the regulations in this subpart, which result in, or create the appearance of:

(a) Using public office for private gain;

(b) Giving preferential treatment to any person;

(c) Impeding Government efficiency or economy;

(d) Losing complete independence or impartiality;

(e) Making a Government decision outside official channels; or

(f) Affecting adversely the confidence of the public in the integrity of the Government." 24 CFR § 0.735–202.

"An employee shall not receive any salary or anything of monetary value from a private source as compensation for his services to the Government." 24 CFR § 0.735–204(b).

"An employee shall not:

(2) Engage in, directly or indirectly, a financial transaction as a result of, or primarily relying on, information obtained through his Government employment." 24 CFR § 0.735–205(a)(2).

conduct required of Haught, we are of opinion that they should have been instructed only as to those standards which reasonably related to the discharge of specific duties as director in turn related to the issues in this case and no more. The essential element of the substantive crime involved here is the solicitation by a public official of a bribe in return for either violating his official duty or being influenced in the performance of an official act. *United States v. Heffler,* 402 F.2d 924 (3d Cir. 1968), cert. den. 394 U.S. 946, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969); 18 U.S.C. § 201(c)(1) & (3). We, of course, recognize that the official action sought to be influenced need not be prescribed by statute but may be governed by a lawful requirement of the executive department under whose authority the official is acting. *United States v. Birdsall,* 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914). Yet, in order to be relevant in a criminal prosecution for conspiracy, these standards must prescribe duties and modes of conduct as opposed to broad ethical and moral precepts.

Thus, insofar as the instruction given the jury involved specific mandates such as prohibiting receipt of any salary from a private source as compensation for his services to the government, or using public office for private gain, etc., there was no error on the part of the district judge. However, that portion of the instruction relating to Haught's duty not to "imped[e] Government efficiency or economy" (24 CFR § 0.735–202) or "affect adversely the confidence of the public in the integrity of the Government" (24 CFR § 0.735–202) invokes standards too indefinite and vague to be a part of our criminal law in this context when there was no charge or evidence that the bribes alleged may have been for such purpose. As to the latter, therefore, we conclude that the jury could have been misled. The same reasoning should apply to that part of 24 CFR § 0.735–202 which prohibits acts not only "result[ing] in" (which, of course, is permissible in an instruction), but also "creat[ing] the appearance of" certain prohibited conduct. We think "creat[ing] the appearance of" official

misconduct, absent any charge or evidence of a bribe for that the purpose is not criminal, although arguable it may subject the actor to civil liabilities. Cf. *United States v. Boyer,* 85 F. 425 (W.D.Mo.1898); *United States v. Gibson,* 47 F. 833 (N.D.Ill.1891).

The government calls to our attention that no objection was made at the trial on account of the jury charge based on the regulations just above set forth, and contends that, if error, it was not plain error. Were this the only point raised on appeal, we might well agree. We mention the matter principally because the case must be tried again.

We are thus of opinion the judgment of the district court must be vacated and the case

*Reversed and Remanded for a new trial.*

BUTZNER, Circuit Judge (dissenting):

I would affirm the judgment of the district court. The critical testimony of both Wilmoth and Ballard was clearly admissible under well recognized exceptions to the hearsay rule.

It is obvious from reading all of Wilmoth's testimony that the government did not call him simply for the purposes of impeachment. Wilmoth's testimony established and corroborated many of the circumstances surrounding the conspiracy, including the fact that Morlang was a partner with other conspirators in one of the real estate ventures. Wilmoth also described the land they sought to develop, discussed their dealings with Haught, an FHA official whom he bribed, and stated that Ballard and Barron contributed money for the bribe. He equivocated when asked if he had told Morlang about the bribe. Only then did the government impeach Wilmoth by showing that, despite his denial, he had told a fellow prisoner that he had pleaded guilty to bribery so that an associate could stay out of jail and take care of the business. The district court admitted the testimony on this point only for the purpose of disparaging Wilmoth's credibility.

The best reasoned cases recognize that it is not realistic to require a party to vouch for the veracity of his witness. Accordingly, courts have long allowed a party to impeach his own witness even when the party was not taken by surprise at the witness's testimony. *See, e. g., United States v. Lineberger,* 444 F.2d 122 (4th Cir. 1971); *United States v. Allied Stevedoring Corp.,* 241 F.2d 925, 932–34 (2d Cir. 1957); *United States v. Freeman,* 302 F.2d 347 (2d Cir. 1962); *see also,* Notes of Advisory Committee on Federal Rules of Evidence, 28 U.S.C. Rule of Evidence 607. I would affirm the district judge's application of these sound authorities.

Also, there was no error in the admission of Ballard's prior inconsistent statement for the purpose of impeaching him. The transcript refutes the assertion that he was not evasive. On direct examination by an assistant United States Attorney, the following colloquy took place:

"Q. Who represented Mr. Morlang in these transactions?

"A. Well, I never was certain, but I assumed it was Mr. Wilmoth.

"Q. As far as you were concerned, did you consider Mr. Wilmoth was the spokesman for Mr. Morlang?

"A. I never gave it a lot of thought on that question."

In contrast, Ballard testified before the grand jury:

"Q. Governor Barron came to meet with you too?

"A. No. Fred Wilmoth was the speaker for Ted Morlang."

There can be no doubt that Ballard's evasiveness at the trial was inconsistent with his unequivocal grand jury testimony. We have long deferred to a trial judge's discretion in allowing the impeachment of a recalcitrant witness. *Harman v. United States,* 199 F.2d 34, 36 (4th Cir. 1952). I would apply this salutary precept here. A comparison of Ballard's testimony at the trial and his testimony before the grand jury shows no abuse of the district court's discretion.