613 A.2d 428

**Ronald NANCE and Kevin Hardy**

v.

**STATE of Maryland.**

**No. 1334, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Oct. 1, 1992.

476

Melissa M. Moore, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellants.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before MOYLAN, MOTZ and HARRELL, JJ.

HARRELL, Judge.

Appellants, Ronald Nance and Kevin Hardy, were tried jointly in a jury trial in the Circuit Court for Baltimore City

(Mitchell, J. presiding). Both appellants were convicted of the following charges: the first-degree murder of Aaron Carroll, the attempted murder of Sandra Keve, conspiracy to murder Aaron Carroll, and related handgun offenses. The trial judge sentenced each appellant to life imprisonment for Mr. Carroll's murder, and, as to each appellant, imposed a consecutive life sentence for the conspiracy, a consecutive thirty year sentence for the attempted murder of Ms. Keve, and a consecutive fifteen year sentence for the handgun violations.

In their joint appeal, appellants raise the following questions:

I. Did the lower court err in refusing to ask if any of the prospective jurors had ever been employed by the Baltimore City Police or a law enforcement agency?

II. Did the lower court err in calling Antonio Harris as a court's witness?

III. Did the lower court err in excluding critical testimony regarding a threat to the victim made by another person or persons not on trial?

IV. Was the evidence sufficient to sustain appellants' convictions?

V. Did the lower court err in its instructions to the jury?

## FACTS

On 3 April 1990, at approximately 9:30 p.m., Baltimore City police responded to a call that there had been a shooting near Exeter and Lombard Streets. Upon arriving on the scene, the officers found the body of Mr. Aaron Carroll, who had been shot to death. Nearby, Ms. Sandra Keve, a bystander, had been hit by the gunfire and was wounded in the right thigh.

Mr. Antonio Harris had witnessed the shooting. He and a friend, Mr. Rodney McCormack, told police that after Carroll was shot they took him to Harris's mother's house, laid him in the front yard, and asked his mother to call an ambulance.

On 4 April 1990, at police headquarters, Harris voluntarily gave Detective Martin Syndor a signed statement, in which he stated that appellants were the shooters and gave his rendition of the events of the night before. From a photographic array, Harris identified appellants as the shooters. Thereafter, Harris testified before a grand jury, telling essentially the same story he had given to the police in his signed statement. Additional facts will be supplied as necessary throughout our discussion.

## I. *VOIR DIRE* EXAMINATION

Appellants contend that the trial judge erred when he declined to ask, during *voir dire* examination, whether any prospective jurors had been employed by the Baltimore City Police or a law enforcement agency. Appellants contend that the omission of this question impeded their ability to strike jurors for cause and to exercise their peremptory challenges intelligently. Even if they were correct as to peremptory challenges, we nonetheless affirm the lower court's ruling.

During *voir dire*, appellant Nance's counsel requested that the trial judge ask the members of the panel whether they, or their relatives or friends, had ever been employed by the Baltimore City Police or other law enforcement agency. The lower court denied the request. The trial judge's *voir dire*, however, did include the following question:

As you have heard from the list of witnesses that have been identified, there may be representatives of law enforcement agencies who will offer testimony during the course of the trial of the case.

Does any member of the jury panel know of any reason why she or he would not be able to consider fairly and impartially the testimony that would be presented by a representative of a law enforcement agency?

In other words, stating it differently, does any member of the jury panel know of any reason why she or he

would not be able to consider the testimony as presented by a representative of a law enforcement agency fairly and impartially?

None of the venirepersons responded affirmatively to these questions. At the conclusion of *voir dire*, and prior to exercise of their peremptory challenges, Hardy's counsel renewed Nance's counsel's previous request.

■■■ The scope of the inquiry on *voir dire* examination is committed largely to the sound discretion of the trial judge. Md. Rule 4–312(d); *Langley v. State*, 281 Md. 337, 341, 378 A.2d 1338 (1977). It is firmly established that the purpose of *voir dire* is to determine if there is cause for disqualification of a prospective juror, and not to facilitate more intelligent use of peremptory challenges. *Davis v. State*, 93 Md.App. 89, 611 A.2d 1008 (No. 954, September Term, 1991, opinion filed 2 September 1992); *Couser v. State*, 36 Md.App. 485, 496, 374 A.2d 399 (1977), *aff'd*, 282 Md. 125, 383 A.2d 389 *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978). Indeed, we have recently addressed the extent to which the trial courts must inquire of a prospective juror's relationship with law enforcement. *Davis, supra*, 93 Md.App. at 115–18, 611 A.2d 1008.

■■ The trial judge did not abuse his discretion in refusing to ask the question requested by appellants. The question that the trial judge did ask adequately addressed any potential bias in favor of law enforcement agencies. See *Shifflett v. State*, 80 Md.App. 151, 153–56, 560 A.2d 587 (1989), *aff'd on other grounds*, 319 Md. 275, 572 A.2d 167 (1990). Thus, the questions propounded by the trial judge adequately covered the information elicited by the requested question. Whether the proposed question would have aided appellants in the exercise of their peremptory challenges is irrelevant.

## II. COURT'S WITNESS

At trial, the State moved the court to call Mr. Antonio Harris as the court's witness, and premised its motion on

the argument that the threshold requirements for calling a court's witness had all been met. First, the State claimed surprise because the last time the prosecutor spoke to Harris he still agreed that his grand jury testimony was the truth. In defense counsel's opening statement, however, counsel claimed that Harris would not testify as the State had expected. Second, Harris was related to Nance as his half-brother. Third, Harris was hostile towards the State because he had been incarcerated on a body attachment for failure to appear in court as a witness in the instant cases at a prior date. Finally, Harris's testimony was material and necessary to the State's case because he was the only witness who had identified the perpetrators.

The lower court held a proceeding out of the jury's presence to determine if there were grounds to call Harris as a court's witness. At that proceeding, Harris testified that he knew both appellants and that he was a half-brother of Nance. Harris also claimed that he did not see either appellant on the evening of 3 April 1990 at the time of the shooting. At this point, the prosecution claimed surprise because Harris previously had identified appellants as the shooters through photographic arrays, in grand jury testimony, and in the signed, written statement. The lower court, over the defense's objection, ruled that it would call Harris as a court's witness. The jury reconvened and the court then conducted an examination of Harris.

When questioned by the court concerning the shooting on the evening of 3 April, Harris testified that he was walking up Exeter Street when he heard gunshots and hid until the gunfire was over. He stated that he had seen Aaron Carroll only after he had been shot and was crying for help. Harris claimed he had not seen anyone else on the street. Harris stated that, once he saw Carroll, he grabbed him around the waist, called to Rodney McCormack to help, and that he and Mr. McCormack walked Carroll to Harris's mother's front yard where they laid him down. Harris then told his mother to call an ambulance. Harris claimed that

after having finished with Carroll, he and McCormack used heroin.

Harris next claimed not to remember speaking to police officers at the scene of the shooting or at the police station. He was also unable to recollect when he appeared before the grand jury. He testified that he never saw who shot Carroll and did not know or see Sandra Keve after she was shot. Harris did state, however, that he had been shown a photo array at the police station at some time and that the police had asked him to sign his name on the back of each photo of someone he knew. He further testified that he could not remember how many photos he signed. After Harris had completed his direct testimony, the State and the defense cross-examined him. During the State's cross-examination of Harris, he acknowledged that the initials and signature on the written statement (marked for identification at that time as State's Exhibit 5) were his, the initials and signature on appellants' photographs from the photo arrays (which photographs were marked for identification at that time as State's Exhibits 3 and 4) were his, and that he had testified, under oath, before the grand jury (the transcript of which was received in evidence at that time as State's Exhibit 6). When confronted by the prosecutor with the questions and answers in State's Exhibits 3, 4 and 5, Harris responded at various times with denials that he made such responses or claimed an inability to recall that he had made such responses.

The State later called Detective Marvin Syndor as its witness. Detective Syndor testified that Harris was cooperative, coherent, and did not appear to be under the influence of drugs or alcohol at the time he gave his statement. The detective further stated that Harris, while giving his statement on April 4th at the police station, had identified appellants as the shooters in the murder of Aaron Carroll. The detective also testified that he had taken the signed statement from Harris and that Harris had identified appellants in a photo array as the persons who had committed

the shooting. The written statement and photographs were then received in evidence.

▇▇▇▇ Appellants urge that the lower court abused its discretion in calling Harris as a court's witness. We agree. When exercising its discretion to call a court's witness, the court is to consider: (1) the close relationship between the witness and the defendant; (2) the existence of contradictory or inconsistent statements; (3) the hostility of the witness; (4) the necessity of the testimony; and, (5) the prosecution's inability to vouch for the veracity or integrity of the witness. *Scarborough v. State,* 50 Md.App. 276, 282, 437 A.2d 672 (1981), *cert. denied,* 292 Md. 639 (1982). The voucher rule, which required a party calling a witness to vouch the witness' veracity, was in effect until January 1, 1989. At that time, the rule was abolished by the adoption of Md. Rule 1–501, which permits any party to attack the credibility of a witness. Since the adoption of Md. Rule 1–501, our cases have stated that the voucher rule has been "eliminated," *Spence v. State,* 321 Md. 526, 528 n. 1, 583 A.2d 715 (1991), and "excised from the rules". *Beghtol v. Michael,* 80 Md.App. 387, 397 n. 3, 564 A.2d 82 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990).[1] More equivocally, *Spence* states, therefore, that "the need for calling one as a court's witness has been greatly reduced, if not eliminated." *Id.* 321 Md. at 528 n. 1, 583 A.2d 715. Our opinion is that the need to call a court's witness, at least insofar as fact witnesses are concerned, simply "no longer exists" for most purposes. *Wright v. State,* 89 Md.App. 604, 610 n. 3, 598 A.2d 1214 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 711 (1992) (citing *Beghtol,* 80 Md.App. at 397 n. 3, 564 A.2d 82). A court's ability to call neutral, expert witnesses remains unaffected by this holding.

▇▇▇▇ Today we hold that the lower court abused its discretion in calling Harris as a court's witness because the

---

1. *See also Brown v. State,* 80 Md.App. 187, 191 n. 1, 560 A.2d 605 (1989).

State could have called Harris and examined him using his out-of-court prior inconsistent statement to Detective Syndor identifying the appellants, the same statement to the grand jury, and his prior photo array identification of appellants as the shooters. We view the lower court's procedural error *per se*, however, as harmless beyond a reasonable doubt. The potential pitfalls associated with the procedure of calling a court's witness have been articulated as follows: "[w]hen however the trial court does permit the procedure whereby a witness becomes the court's 'own witness' the judge must be scrupulously careful to preserve an attitude of impartiality and should never give the jury the impression he is of the opinion that the defendant is guilty." *Patterson v. State*, 275 Md. 563, 578, 342 A.2d 660 (1975). The "trial judge should call a witness as a 'court witness' only when the adversary system fails to produce the necessary facts and a miscarriage of justice would likely result." *Id.* at 577, 342 A.2d 660.

■ By virtue of the authority vested in his or her position, the trial judge must be exceedingly careful not to editorialize in ruling on evidence and must refrain from expressing or implying an opinion on those facts to be decided by the jury. *Id.* at 578–79, 342 A.2d 660. Viewing the judge's conduct in the instant case in light of these caveats, we conclude that the procedural error committed in calling Harris as a court's witness was harmless. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

First, the judge in this case properly explained his role to the jury, in a general fashion, at the beginning of the trial. He then explained his role with specific regard to the jurors' view of any questions he might ask a witness. Second, at the close of the trial, the judge instructed the jurors that they were to treat anything he may have said, other than his instructions to them as to the applicable law, as irrelevant to their deliberations on the outcome of the case. This admonition was repeated specifically as to his questioning

of witnesses.[2] Finally, the judge was "scrupulously careful to preserve an attitude of impartiality" during the entire segment of the trial devoted to the Harris testimony. *Patterson*, 275 Md. at 578, 342 A.2d 660. The record reflects that the State's motion to call the court's witness was made and granted out of the jury's presence. Additionally, the judge's interrogation of Harris was limited to questions designed to elicit simple factual responses. And, significantly, neither appellant Nance's nor appellant Hardy's counsel objected to any of the judge's questions. Moreover, both the State and appellants' counsel had full opportunity to cross-examine Harris. Accordingly, we hold that calling and interrogating Harris as a court's witness was harmless error in this case.

At this point, we deem it necessary to dispel potential confusion among the cases regarding the interplay of the voucher rule, the calling of a court's witness, and the use of out-of-court, prior inconsistent statements and identifications in the case *sub judice* for substantive purposes.

In *Spence v. State*, 321 Md. 526, 531, 583 A.2d 715 (1991), the Court of Appeals held that Md. Rule 1–501 prohibits the use of pretext or "subterfuge" to place otherwise inadmissible evidence before the jury. In *Spence*, the Court held that the out-of-court, prior inconsistent statement of the improperly-called court's witness was not admissible for either substantive or impeachment purposes. *Id.* at 530, 583 A.2d 715. Insofar as substantive evidence is concerned, there is language in *Spence* to suggest that Harris's prior statements and identifications in the case *sub judice* should not have been admitted for substantive purposes. *Spence*, 321 Md. at 530, 583 A.2d 715. We believe that *Spence* is inapposite to and distinguishable from the instant case.

The Court of Appeals, in *Bedford v. State*, 293 Md. 172, 443 A.2d 78 (1982), held that an extrajudicial identification by an eyewitness made in a formal procedure, such as a

---

2. We note that appellants neither took exception to any of these instructions nor requested supplementary instructions on this issue.

photo array or lineup, or in a written statement, is admissible as substantive evidence, through the testimony of a police officer who was present when the identification was made and even though the eyewitness is unable to corroborate his or her prior identification of the defendant at trial, provided the eyewitness is available for cross-examination at trial and there is no finding that the extrajudicial identification process, if any, was unduly suggestive or otherwise improper. This Court, in *Joiner v. State,* 82 Md.App. 282, 571 A.2d 844 (1990), construed the holding of *Bedford* to include extrajudicial oral identification statements as well, even where the identifying witness actually recanted his prior identification of the defendant as his assailant at trial.

The Court of Appeals in *Spence* made no mention of *Bedford* or *Joiner.* We, on the other hand, in *Wright v. State,* 89 Md.App. 604, 598 A.2d 1214 (1991), endeavored to distinguish *Wright* and *Spence* from *Joiner.* In *Wright,* the prosecutor was aware before trial that a potential State's witness would testify that he had not seen the defendant on the night of the shooting, contrary to his pretrial statements to police and the grand jury that he had seen the defendant with a gun immediately after the shooting. The State prevailed upon the trial court to call the witness as a court's witness and, during the State's cross-examination, got into evidence as "impeachment" evidence the witness's prior inconsistent statements. We held, explicitly following *Spence,* that it was an abuse of the trial judge's discretion to call the witness as a court's witness where the process was used as a subterfuge by the State to establish a "straw man" through which to introduce, in the guise of impeachment evidence, the witness's inconsistent extrajudicial statements as substantive evidence of the defendant's guilt. We did not allude to *Bedford* in our discussion in *Wright.*

The case *sub judice* attempts to reconcile *Joiner, Spence, Wright,* and *Bedford* in a principled fashion. Essentially, as we see it, *Joiner* and *Bedford* are limited holdings, by their own terms, to the evidentiary rule addressing prior

identifications. *Spence* and *Wright* do not involve prior identifications and are therefore distinguishable. In both *Wright* and *Spence,* the prior inconsistent statements concerned the defendant's participation or involvement in the crime, not an extrajudicial identification *per se* of the perpetrator. This is the basis upon which we relied in *Wright,* 89 Md.App. at 609–610, 598 A.2d 1214, to distinguish it and *Spence* from *Joiner.*

It was conceded by the State in *Spence* that the prior statement was not admissible for substantive purposes. *Id.* 321 Md. at 530, 583 A.2d 715. No such concession was made in the case *sub judice.* As we stated in *Joiner,* so long as the witness was available for cross-examination, which Harris was in the instant case and would have been even had the State simply called him as a State's witness, the prior statements of identification were admissible substantively.

We believe also that the federal authorities relied on in *Spence* are inapposite to the present case. *United States v. Morlang,* 531 F.2d 183 (4th Cir.1975) and *United States v. Webster,* 734 F.2d 1191 (7th Cir.1984) involved the introduction of hearsay evidence (prior inconsistent statements used to "impeach" witnesses whom the prosecutors knew would renege on their prior out-of-court statements) which, under the federal equivalent of Md. Rule 1–501 (Rule 607), would be otherwise inadmissible. The Federal Rules of Evidence provide, however, in Fed.R.Evid. 801(d)(1)(C), an equivalent to the holdings in *Bedford* and *Joiner* regarding the admissibility of out-of-court identification statements. That rule provides, in pertinent part, that "a statement is not hearsay if ... [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (c) one of identification of a person made after perceiving him ..." That rule was applied by the Seventh Circuit in a case similar to the case *sub judice.* In *U.S. v. O'Malley,* 796 F.2d 891 (7th Cir.1986), a witness/co-conspirator recanted his prior statement identifying from a photospread a defendant as a co-conspirator. The

government called the FBI agent who had been present at the time the witness identified the defendant in the out-of-court statement. It was clear from the record in *O'Malley*, as it is in the case *sub judice*, that the out-of-court identification statement was offered and received as substantive, not impeachment, evidence. Accordingly, since a basis existed for the receipt of the extrajudicial identification statement as substantive evidence, the court found the testimony was properly admitted at trial.

■■■ It is well settled in Maryland that testimony by a third party as to the extrajudicial identification of a defendant by an eyewitness is admissible as substantive evidence where the eyewitness is also present in court and available for examination. *See, e.g., Joiner v. State,* 82 Md.App. 282, 571 A.2d 844 (1990) (police officer to whom victim made identification statement of his assailant and had selected assailant's picture from photo array permitted to testify as to extrajudicial identification even where victim recanted prior identification); *Bullock v. State,* 76 Md.App. 85, 543 A.2d 858 (1988) (deputy sheriff allowed to testify as to drive-by lineup identification of defendant by victim shortly after assault where victim was unable to identify defendant at trial and could not remember what happened at lineup identification); *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982) (police officer permitted to testify that victims had selected defendant's picture from photo array even though victims, due to poor memory at their advanced ages, could no longer independently identify defendant as their assailant); *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965) (police officer allowed to testify to an extrajudicial identification of defendant by witness even though witness did not corroborate that identification). The common threads running through these cases justifying this conclusion are: (a) the spontaneity and formality of the extra-judicial identification, such as in the format of written statements, sworn testimony, and non-suggestive photo arrays and lineups, taking place in relative temporal proximity to the crime, establish a sufficiently reliable basis to serve for an excep-

tion to the hearsay rule; and, (b) the defendant's right to confront the identifying witness is satisfied.. None of these cases, however, present precisely the same factual situation that exists in the case *sub judice,* i.e. the availability of the eyewitness at trial was obtained through an erroneous procedural mechanism (a court's witness), and, the eyewitness, when questioned, alternated between recanting his prior identifications of the defendants and claiming he could not remember making such statements. *Joiner* comes closest to a parallel situation; however, the witness/victim in *Joiner* was allowed as a surprise State's witness, not as a court's witness. Moreover, none of the Court of Appeals' opinions involved a situation where the eyewitness recanted his prior extrajudicial identifications. Notwithstanding this, we are of the opinion that the principles discussed in *Bedford* and *Joiner* are sufficiently elastic so as to encompass the facts of the case *sub judice.*

As our previous analysis has led us to the conclusion that the trial court's procedural error in calling Antonio Harris as a court's witness was harmless beyond a reasonable doubt, we also conclude that Harris's availability for cross-examination by appellants satisfied their right of confrontation. Both appellants engaged in cross-examination of Harris. The imperfect procedural vehicle by which Harris was made available does not upset this conclusion, just as a claimed procedural defect did not avert a similar result in *Bullock v. State,* 76 Md.App. 85, 543 A.2d 858 (1988). In *Bullock,* the victim was not asked by the State during its case-in-chief whether he had identified the defendant as his assailant in a drive-by lineup conducted shortly after the robbery and assault had occurred. Instead, the State later called the deputy sheriff present when the victim made the identification who testified as to the victim's identification of Bullock. The trial judge denied Bullock's request to recall the victim for cross-examination during the State's case-in-chief. Consequently, Bullock called the victim as his witness during his case. On appeal, Bullock claimed error in allowing the deputy sheriff to testify as to the extrajudi-

cial identification because the victim himself did not testify on direct examination as to his identification of his attacker.[3] We found, however, that the opportunity to call the victim as a witness for the defense and question him about the identification is sufficient to satisfy Bullock's right to confront the witnesses against him. *Id.* at 93, 543 A.2d 858.

Before addressing whether Harris's recantation of his prior identifications so undercut their reliability as to render them unfit to be considered substantive evidence of Nance's and Hardy's guilt, we note that Harris did not consistently deny the critical identifications in each of the out-of-court statements. A review of the totality of his testimony regarding the written statement, the photo arrays, and the grand jury testimony does not reveal a pattern of denial. Instead, there were random swings between denial of portions of his prior statements and, in other instances, claims of an inability to remember that he had said that which the prior statement reflected on its face. For purposes of our analysis, however, we will treat Harris's trial testimony as a blanket denial that he had previously identified Nance and Hardy as the shooters.

The rationale for admitting evidence of an extrajudicial identification as substantive evidence of identity was explained by the Court of Appeals in *Bedford,* where, citing with favor a portion of the opinion of the Supreme Court of California in *People v. Gould,* 54 Cal.2d 621, 626–27, 7 Cal.Rptr. 273, 275, 354 P.2d 865, 867 (1960), it approved the following:

> "Evidence of an extrajudicial identification is admissible, not only to corroborate an identification made at the trial, but as independent evidence of identity. Unlike other testimony that cannot be corroborated by proof of prior

---

**3.** Bullock learned during his examination of the victim that the probable reason the State had not inquired of the victim as to his prior identification was that he didn't remember making the identification. The victim explained, as to why he couldn't recollect what happened at the drive-by lineup: "Well, I was in a complete sweat at that time and emotionally upset."

consistent statements unless it is first impeached, evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination." 293 Md. at 177–78, 443 A.2d 78 (citations omitted).

Citing with equal favor the Supreme Judicial Court of Massachusetts in *Commonwealth v. Torres*, 367 Mass. 737, 739, 327 N.E.2d 871, 873–74 (1975), the Court of Appeals seemingly accepted that

"A pre-trial identification is regarded as having equal or greater testimonial value than one made in court because the circumstances of the earlier identification often were less suggestive and because that identification occurred closer to the time of the offense.

"Even if the witness does not identify the defendant in his or her testimony at trial, any pre-trial identification of the defendant by that witness in constitutionally proper circumstances should be given probative value. Although the probative value of any evidence of such identification is for the jury, that evidence, if believed, tends to prove that the defendant was the perpetrator of the crime. The trend of decisions is to permit such evidence to be introduced. We join in that view and do not understand the defendant to argue otherwise." 293 Md. at 178–79, 443 A.2d 78 (Citations omitted).

To be sure, most of the cases explain that the reliability of the earlier identification is not impaired by the failure of

the witness to repeat it at trial because such a later inability to corroborate the identification may be due to "loss of memory or other circumstances." *See Gould, supra* at 627, 7 Cal.Rptr. 273, 354 P.2d 865. We directly, and the Court of Appeals by implication, have expressed the view that, even where the identification witness recants at trial, the reliability of the earlier out-of-court statements may not be so impaired as to their intrinsic reliability so as not to be fit to be weighed by the trier of fact as substantive evidence.

In *Bedford,* the Court of Appeals made reference to yet another opinion of the Supreme Judicial Court of Massachusetts. In *Commonwealth v. Fitzgerald,* 376 Mass. 402, 409–10, 381 N.E.2d 123, 130 (1978), that court was confronted with a victim/witness who had identified the defendants as her assailants from a photo array conducted on the morning the assault occurred. At trial, she denied that the defendants had been present in the apartment where the assault occurred on the day in question. The defendants attacked as unreliable the admissibility of the victim's photo identification as substantive evidence against them. In disposing of this challenge, the court reasoned:

"... there is no claim before us that the photographic identifications were made under suggestive conditions, and, as discussed *supra,* the defendants had an opportunity to cross-examine and did thoroughly cross-examine [the victim] concerning the accuracy of these identifications. Where, as here, the identifications were not made under suggestive conditions and thus their admission was not precluded and where the defendants were given and, in fact, took advantage of, ample opportunity to expose to the jury any factors tending to discredit the identifications, we cannot conclude that they were so unreliable that they should not have been admitted as substantive evidence. Rather, the assessment of the reliability of the identifications in these circumstances was for the jury." 293 Md. at 182, 443 A.2d 78 (citations omitted).

We glean from these references that the Court of Appeals would hold to the same effect if confronted with a recanting identification witness in a comparable case.

This Court, on the other hand, has squarely addressed this variation in *Joiner v. State*, 82 Md.App. 282, 571 A.2d 844 (1990). In *Joiner*, a victim/witness recanted at trial his earlier extrajudicial identification of the defendant. The victim had made both written and oral statements to police and had identified the defendant's photograph from an array as the person who assaulted him. Prior to and at trial, the victim recanted his identification of the defendant saying he only named him as his assailant because he was "mad at him." At trial, the victim admitted he had made the written statement to police, but, as to the photo identification, stated he could not remember writing on the back of the assailant's photograph, "This is Keith Joiner. He shot me." The police officers who were present at the time the victim made his written and oral statements and when the photo identification process was conducted testified as to what happened at each event. Both the written statement and the photo identification were received as substantive evidence against Joiner. Although Joiner objected to the receipt of this evidence, the basis of his objection did not include a challenge to the photo array process as suggestive. Referring to *Bedford v. State* as "a controlling Maryland case on the admissibility of extrajudicial identification," we affirmed the trial court's ruling. *Id.* 82 Md.App. at 290, 571 A.2d 844. Thus, even in the face of a recanting identification witness, as long as that witness was available for cross-examination and there was no finding that any extrajudicial identification process was unduly suggestive, we found that such identifications, whether in the form of oral or written statements, or formalized identification processes such as photo arrays or lineups, are admissible as substantive evidence through the testimony of the police officers that were present when the identifications were made. We also recognized that it was for the trier of fact to assess the weight and reliability of the inconsistent

statements of identification in these circumstances. *Id.* at 294, 571 A.2d 844.

## III. HEARSAY TESTIMONY

Appellants contend that the lower court erred in ruling that certain proffered testimony from Ms. Carmello Nance, appellant Nance's sister, was inadmissible hearsay.

■ Ms. Nance testified that someone other than appellants had threatened Aaron Carroll on the day Mr. Carroll was shot. Prior to her testimony, defense counsel proffered that Ms. Nance would testify that she had witnessed a fight involving Mr. Carroll, his brother, "Boo", and two others, "Spark", and "Brucie". An earlier witness, Thomas Brown, testified in his statement that "Tater (appellant Nance) and his boys banked Aaron and Aaron ran away saying its going to be war." Counsel proffered that Ms. Nance heard the same statement made by "Brucie and/or Spark" to Aaron Carroll in the fight she observed. The lower court permitted her to testify to the fight, but not to the statement. The lower court ruled that the testimony was inadmissible hearsay as it was offered for the truth of the matter asserted. The court ruled the statement inadmissible because the assertion was that these people, rather than someone else, had said these words; the words were not offered merely to show that the words had been said.

Relying upon *Foster v. State*, 297 Md. 191, 464 A.2d 986 (1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984), appellants argue that the testimony was admissible as an utterance intended to show simply that someone other than appellants threatened the victim. Appellants claim the statement showed someone other than appellants had threatened the victim during a fight and may have had a motive to kill him. Thus, appellants urge that the exclusion of this evidence deprived them of a fair trial.

Unlike the testimony in *Foster*, which the court ruled admissible, the testimony excluded in the instant case, if it was hearsay, was inadmissible because it lacked sufficient

indicia of reliability to assure its trustworthiness. The testimony would have been offered by appellant Nance's sister, a witness likely to have be biased in her brother's favor. Moreover, there is nothing in the record to indicate that Ms. Nance's statement was made spontaneously and there was no corroborative evidence to support the statement. *Compare Foster,* 297 Md. at 211, 464 A.2d 986. Indeed, our conclusion is further buttressed not only by the lack of corroborative evidence, but by the testimony of other witnesses who stated that appellants had threatened and fought with Carroll earlier in the day.

■ *Foster* involved an unambiguous threat to kill leveled at the victim. The proffered testimony in the case *sub judice* is less clearly of that quality. Even if Brucie or Spark had said to Carroll, "its going to be war", such a statement is subject to several possible interpretations, some of which do not necessarily convey a threat to kill Carroll. As we observed in *Worthington v. State,* 38 Md.App. 487, 498, 381 A.2d 712 (1978):

> While it is conceivable that the existence of animosity by some members of the community toward [the victim] could raise an inference that they, rather than appellant, were the perpetrators of [the victim's] injuries, we feel, as did the trial judge, that such a connection is, in the absence of real evidence pointing toward appellant's theory, totally speculative and tenuous.

A reasoned argument can be made that the proffered testimony was not hearsay. Were that so, however, the tenuous and speculative import of the challenged statement renders it susceptible to exclusion on the basis of relevancy. Thus, we conclude that the trial judge correctly ruled that the statement was inadmissible, whether for the reason he gave or the one we have supplied.

## IV. SUFFICIENCY

Appellants also challenge the sufficiency of the evidence to support their convictions. In determining whether there

is sufficient evidence to support the convictions, we must view the evidence in the light most favorable to the prosecution and sustain the convictions if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056 (1986). Our review is very limited. Weighing the credibility of witnesses' testimony and resolving any conflicts in the evidence are tasks proper for the fact finder. *Bryant v. State,* 49 Md.App. 272, 283–84, 431 A.2d 714, *cert. denied,* 291 Md. 772, 782 (1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

In the instant case, appellants were convicted of the first-degree murder of and conspiracy to murder Aaron Carroll, the attempted murder of Sandra Keve, and the related handgun offenses. It was established that Carroll was shot to death and that Sandra Keve was wounded by gunfire. Appellants argue that their convictions cannot stand because there is insufficient evidence as to the identity of the person(s) who committed these crimes.

In *Joiner v. State, supra* 82 Md.App. at 292, 571 A.2d 844, we recognized that an extrajudicial identification, such as a lineup, photographic array or statements of identification, constitutes an admissible prior, extrajudicial identification. *Id.* In that case, we stated, "so long as the witness is available for cross-examination, third parties who witness these types of identifications are permitted to testi- fy regarding them." *Id.* An extrajudicial identification made by a witness may be used as substantive evidence. *Bedford,* 293 Md. at 176, 443 A.2d 78 (1982).[4] An extrajudicial photographic identification is sufficient evidence of a defendant's criminal agency, even if the identifying witness fails to repeat the identification in court. *Id.*

---

**4.** An extrajudicial identification may also be used for impeachment and for corroboration. *Bedford,* 293 Md. at 176, 443 A.2d 78.

▮▮▮ Prior to trial, Antonio Harris, an eyewitness to the shootings, when viewing a photo array, identified appellants as the shooters; Mr. Harris again identified appellants as the shooters in his signed statement to police, and testified that appellants were the shooters in his grand jury testimony. The fact that Harris, at trial, recanted his identification of Nance and Hardy as the shooters and testified that he did not see anyone on the street at the time of Carroll's murder does not preclude a finding that appellants were in fact the persons who committed the crimes. *Bedford,* 293 Md. at 176, 443 A.2d 78. Moreover, Officer Syndor's testimony supported Harris's earlier identification of appellants as the shooters. Because Harris was available for cross-examination, the detective's testimony regarding Harris's extrajudicial identification is admissible as substantive evidence. Accordingly, we hold that the convictions are supported by sufficient evidence.

## V.  JURY INSTRUCTIONS

Appellants argue that the lower court erred in instructing the jury. Specifically, appellants point to the jury instructions regarding prior inconsistent statements of some of the witnesses and evidence of threats to these witnesses.

▮▮▮ Maryland Rule 4–325(c) states that a trial court may instruct the jury as to the applicable law, but need not give a requested instruction if the matter is fairly covered in the instructions actually given. *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). In the instant case, the trial judge instructed the jury with respect to prior inconsistent statements as follows:

If a prior inconsistent statement involves an extra judicial, that is out of court identification of the defendants, then the identification is admissible as substantive evidence if the witness admits to making the state—the out of court identification but not that it was true at the time.

Contrary to appellants' view, this instruction is a correct statement of law for the reasons stated in Part IV of this opinion.

Appellants further argue that the trial judge's instruction regarding threats to some of the witnesses was not generated by the evidence. We disagree.

In Harris's prior statement to police, he stated that he had been taken to the office of the defense counsel for Matthew Troy Evans, a third defendant in this case.[5] The attorney asked Harris if he was testifying against Evans, Nance, or Hardy. Harris responded that he was not testifying and told the attorney he would not appear in court. Harris gave this answer because Ernest Barnes, a friend of Evans, was present and Harris was afraid that Barnes would harm him or get someone else to do so. Harris told police that Barnes was present and seated next to Harris the entire time he was in the attorney's office. Harris was frightened of Barnes because Barnes was known to hurt people with whom he had problems.

The court admitted other testimony regarding threats. Another witness, Thomas Brown, testified that he received a letter from appellant Hardy. In a prior statement to police, Brown stated that he thought the letter meant that he was the only person left on the street to kill Harris. He denied this statement at trial, where he stated that the letter meant he was the only one left on the street to get all the witnesses together to come to court.

The lower court's jury instructions were relevant to its consideration of the prior inconsistent statements of some of the witnesses and evidence of threats to these witnesses. Because the issues were generated by the evidence and the weight of testimony and credibility of the witnesses were

---

5. The record reflects that the charges against Evans had been nol prossed prior to appellants' trial but Evans had been reindicted after appellants' case had been set for trial.

properly left within the province of the jury, we hold that the lower court did not err in its instructions.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.